[S. F. No. 17377. In Bank. Sept. 29, 1947.]

KAISER COMPANY, INC., (a Corporation), Plaintiff and
 Appellant, v. J. M. REID, as County Tax Collector, etc.,
 et al., Respondents; UNITED STATES OF AMERICA,
 Intervener and Appellant.

Frank J. Hennessy, United States Attorney, William E. Licking, Assistant United States Attorney, Sewall Key, Acting Assistant Attorney General, J. Louis Monarch and Berryman Green, Special Assistants to the Attorney General, for Appellants.

Fred N. Howser, Attorney General, Daniel N. Stevens, Deputy Attorney General, Francis W. Collins, District Attorney, Thomas M. Carlson, City Attorney (Richmond), and Frederick Bold, Jr., for Respondents.

SPENCE, J.—Plaintiff seeks by this action to secure the refund of taxes levied upon its possessory interest as a tenant of Richmond Shipyards Nos. 3 and 3-A and paid by it under protest for the tax year 1943-1944. (Rev. & Tax. Code, § 5138.) There are two causes of action involved: the first concerns the payment of the tax levied by the county of Contra Costa in the sum of $25,136.06, and the second concerns the payment of the tax levied by the city of Richmond in the sum of $18,083.20. The United States has intervened in support of plaintiff by reason of its agreement to reimburse plaintiff for all taxes paid in connection with the operation of the shipyards. The case was heard upon an agreed statement of facts, findings were made relative to the respective causes of action, and separate judgments were entered sustaining each of the challenged tax levies. It is from these judgments that this appeal is prosecuted.

The levies were computed as ad valorem taxes upon possessory interests in real property, and the sole point here in controversy is the legality of such levies. Each of the assessments is premised upon the same concept of tax liability—plaintiff's possessory interest in the two shipyards—and each recognizes this distinction in the status of plaintiff's occupancy of the property. As to Shipyard No. 3, the United States owned both the fee and the shipbuilding facilities erected thereon; but as to Shipyard No. 3-A, only the facilities were owned by the United States while the land was owned by a private corporation and leased to plaintiff for

the express benefit of the United States as part of the national wartime shipbuilding program. The facilities in both shipyards were constructed by plaintiff in pursuance of a "Facilities Contract" executed with the United States. With respect to Shipyard No. 3, plaintiff's assessment was computed in relation to its possessory interest in both the land and the improvements; but with respect to Shipyard No. 3-A, the entire value of the leased land was assessed to the fee owner and plaintiff's assessment was limited to its possessory interest in the improvements. The record herein and applicable legal considerations stemming therefrom in the light of the pertinent tax statutes of this state sustain the propriety of these tax levies and plaintiff's liability therefor.

In 1942, plaintiff contracted with the United States Maritime Commission to build certain cargo vessels at Richmond Shipyards Nos. 3 and 3-A. As above stated, the former was owned by the United States while the latter was owned by a private corporation, the Santa Fe Land Improvement Company, and was leased to plaintiff. Under the terms of the "Vessel Construction Contracts," plaintiff operated the shipyards as a contractor on a cost-plus-a-fixed-fee basis and "without payment of rent," had the right of "exclusive use and possession of the Facilities owned by the Commission and any land owned by the Commission on which such Facilities or any part thereof may be situated for the sole purpose of constructing the Vessels" for the United States pursuant to the Emergency Cargo Ship Construction Program. (U. S. Stats. at L., vol. 55, pt. I, Public Laws, ch. 5, p. 5.) The contracts called for the progressive construction and delivery of vessels: the specified delivery date for the building of the last vessel in Shipyard No. 3 being August 8, 1944, and in Shipyard No. 3-A being November 16, 1944. Payment of the fixed fee for one type of vessel, upon launching and delivery, was scheduled at $150,000 and for another type of vessel at $35,000, with bonuses in both cases if the costs of construction were less than the agreed amounts, and with bonuses or penalties of $200 per day for each day by which the dates of delivery preceded or followed the specified delivery dates. Plaintiff was to be reimbursed for all costs directly or indirectly attributable to the maintenance of the shipyards and the construction of the vessels. The contracts were not transferable. Provision was made for termination of the contracts if plaintiff failed to "use

due diligence'' in the performance of the work, or upon plaintiff's insolvency; and in the event of such default the United States Maritime Commission was given the right of reentry in the shipyards. The contracts also contained an optional cancellation clause in favor of the commission, upon written notice to plaintiff.

On the first Monday of March, 1943, plaintiff was occupying the two shipyards and using the facilities thereon in the performance of its ''Vessel Construction Contracts.'' Accordingly as of that date, the County Tax Collector of Contra Costa County and the City Tax Collector of Richmond each assessed plaintiff upon its possessory interest in Richmond Shipyard No. 3, both as to land and facilities, and in Shipyard No. 3-A as to the facilities only. Similar valuation factors were used in both cases in arriving at the assessment figure of $806,200 for the possessory interest in the facilities and $13,900 for the possessory interest in the land.

The computation schedule for the government-owned facilities in the two shipyards shows the following items: The actual book cost of labor and materials used in construction was ascertained at $11,735,625, to which was added 14 per cent for cost of overhead expenses, or $1,642,987.50, giving a total of $13,378,612.50; from such total 20 per cent thereof, or $2,675,722.50, was subtracted on the premise that wartime conditions made the costs abnormally high, giving $10,702,890 as the value of the facilities new on March 1, 1943; then a depreciation allowance for a one-year use period was made by depreciating each improvement (by groups of like construction and use) at rates varying from 3 per cent to 20 per cent for a total of $1,067,110, which, when subtracted from the above figure of $10,702,890, gave $9,635,780 as the value of reversion as of March 1, 1944, and multiplying this latter sum by .9434 (the present value factor at 6 per cent) resulted in $9,090,394* as the present value of the reversion as of March 1, 1943; next there was subtracted from the aforesaid sum of $10,702,890, the value of the facilities on March 1, 1943, the sum of $9,090,394, the present value of the reversion on March 1, 1943, to give the sum of $1,612,500* as the present value of plaintiff's one-year possessory interest; and 50 per cent of this amount, or $806,200,* was fixed as the assessment figure.

---

*In round figures.

The computation schedule for the government-owned land in Shipyard No. 3 shows the following items: The cash value of 125.365 acres of land, in fee, was fixed at $3,000 per acre, or $376,095; from this sum 5 per cent thereof, or $18,804.75, was deducted because the use of the land was restricted, giving $357,290* as the base value of the land; then this latter figure was multiplied by 8½ per cent (6 per cent as proper investment return value and 2½ per cent, being roughly one-half of the combined county and city rates of 3.065 plus 2.205, or 5.27 per cent) to give the sum of $30,369* as the annual worth of the land; next this latter figure was discounted by multiplying it by .9174 (the present worth of one deferred one year at 9 per cent discount), giving $27,860* as the present value of plaintiff's one-year possessory interest; and 50 per cent of this amount, or $13,900,* was fixed as the assessment figure.

Plaintiff appealed to the Board of Supervisors of the County of Contra Costa and to the council of the city of Richmond, each sitting as a board of equalization for the respective governmental units, for an elimination of the assessed valuations on its possessory interest in the aforesaid land and improvements. After hearing all the evidence that was offered, the respective boards denied plaintiff's applications. Thereupon, and on August 31, 1943, plaintiff paid against the total assessment of $820,100 ($806,200 for the improvements and $13,900 for the land) the county tax of $25,136.06, computed at the rate of $3.065 per $100 of assessed valuation, and the city tax of $18,083.20, computed at the rate of $2.205 per $100 of assessed valuation, for the tax year 1943-1944 upon its possessory interest in the aforesaid property. Within six months thereafter this action was commenced.

Upon the trial of the case, the court, after considering the agreed facts as above outlined and reviewing the proceedings before each of the aforesaid boards of equalization, made findings and entered separate judgments sustaining the respective county and city tax assessments against plaintiff. It found, among other things, that at the respective board hearings, "plaintiff was afforded an opportunity to offer all the evidence it desired with reference to the alleged overvaluation of its possessory interest in said land and improvements and facilities"; that "after receiving all the evidence,"

*In round figures.

each board "found and determined that the assessed valuation of plaintiff's said possessory interest in said [property] was the full cash value thereof, and . . . was not arbitrary, excessive, exorbitant, discriminatory or inequitable"; that on the assessment date "plaintiff had a substantial and taxable possessory interest in said land, improvements and facilities"; that "in arriving at [the] assessed valuation of said possessory interest, [each] Assessor intended to and did include only such possessory interest as plaintiff had in and to said land and improvements owned by the United States and intended to and did exclude from said assessment any and all rights, title and interest of the United States in and to said property"; that each "Assessor exercised an honest, fair and impartial judgment as to what should be included as improvements to the land for the purpose of assessing the value of plaintiff's possessory interest therein, and what should be excluded therefrom as personal property"; that "the method used by [each] Assessor . . . was calculated to result in a valuation fairly representing the net worth on the first Monday in March, 1943, of the annual benefits over the estimated term of plaintiff's possessory right to and interest in said land and improvements known as Shipyards No. 3 and 3-A"; that "the method used by [each] Assessor was reasonable and fair," and that "the refusal of [each] Board of Equalization to grant the plaintiff's application and protest does not constitute actual or constructive fraud or anything equivalent to fraud," but that each "brought its honest judgment to bear upon the question and denied plaintiff's application without fraudulent, discriminatory or arbitrary action."

Plaintiff and the United States as intervener unavailingly urge these points in their appeal from the judgments entered herein: (1) That plaintiff's right to use and possess the two shipyards was not "property" within the meaning of the California Constitution and tax statutes; (2) that even if such right were properly regarded as "property" under the law of this state, it was without taxable value; (3) that the tax levies were invalid under the Fourteenth Amendment of the federal Constitution because they amounted to an assessment upon property owned by the United States; and (4) that the facilities in Shipyard No. 3-A were personalty and a possessory interest therein was not subject to assessment

under California statutes. These points will be discussed herewith in their order of presentation as above stated.

█ "Possessory interests" in "land or improvements" are taxable under section 107 of the Revenue and Taxation Code and in pursuance of the constitutional mandate that "all property . . . shall be taxed." (Const., art. XIII, § 1.) Illustration of this class of taxable estate is found in cases involving possessory interests in property which is tax exempt by virtue of ownership in the federal government (*State of California* v. *Moore*, 12 Cal. 56; *People* v. *Shearer*, 30 Cal. 645; *L. E. White Lumber Co.* v. *County of Mendocino*, 177 Cal. 710 [171 P. 799]), by virtue of ownership in the state government (*San Pedro, Los Angeles & Salt Lake Railroad Co.* v. *City of Los Angeles*, 180 Cal. 18 [179 P. 393]; *Outer Harbor Dock & Wharf Co.* v. *City of Los Angeles*, 49 Cal.App. 120 [193 P. 137]) or by virtue of ownership in a city government (*Hammond Lumber Co.* v. *County of Los Angeles*, 104 Cal. App. 235 [285 P. 896]). Thus, in declaring possession of an agricultural claim upon public lands to be taxable, this court early said in the Shearer case at pages 655-657: "The possession itself of the public lands and the improvements thereon, whether by naked trespassers, or those who claim in addition a right of pre-emption, as to everybody except the United States, have always in California, and in most, if not all of the new States, been regarded as valuable property interests. . . . These possessions, then, are recognized as a *species of property* subsisting in the hands of the citizens. It is not the land itself, nor the title to the land, nor is it the identical estate held by the United States. It is not the pre-emption right, but is the possession and valuable use of the land subsisting in the citizen. *Why should it not contribute its proper share, according to the value of the interest, whatever it may be, of the taxes necessary to sustain the Government which recognizes and protects it?*" (Emphasis added.)

█ Plaintiff's possessory interest in the shipyards under the "Vessel Construction Contracts" was properly classifiable as an "estate for years" in that it was "to continue for a fixed or determinable period" though subject to earlier termination upon certain conditions. (Burby on Real Property [Hornbrook Series, 1943], § 112, pp. 149-150.) Thus, plaintiff had the right to "exclusive use and possession" of the property "until the last of the Vessels shall have been completed" according to the schedule of delivery dates. Con-

sistent with the interests of the government in its shipbuilding program were the two grounds specified for termination of plaintiff's tenancy of the shipyards: (1) its failure to "use due diligence in proceeding with the performance of the work" and (2) its insolvency; and the provision giving the Maritime Commission the right of reentry upon the occurrence of either of the "events of default." Likewise appropriate to the government's purpose was the optional cancellation clause, permitting the commission "at any time prior to the completion of the work to be performed" to "cancel" the contracts "upon written notice to" plaintiff, and so protect the government in case of a short war or plaintiff's inability to construct vessels properly. So pertinent in this regard is the testimony of the regional counsel for the commission before the boards of equalization: "In fighting a war, of course, the only reason for changing a contractor—that is, that would be justifiable—would be that the contractor wasn't doing his job."

■ Such provisions for cancellation and termination, however, did not establish plaintiff's right to use the shipyards as no more than a permit or license which could not be responsible for a "property" tax. As stated in *Von Goerlitz* v. *Turner*, 65 Cal.App.2d 425, at page 429 [150 P.2d 278]: "The test . . . 'whether an agreement for the use of real estate is a license or a lease is whether the contract gives *exclusive possession of the premises against all the world, including the owner,* in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license, and this is a question of law arising out of the construction of the instrument.' " (Emphasis added.) ■ Here, as above noted, plaintiff's "use and possession" of the shipyards under the contracts was "exclusive" even as against the United States in the light of the provision for the Maritime Commission's "right of re-entry" upon the default contingencies. So significant is the language in *Hammond Lumber Co.* v. *County of Los Angeles, supra,* 104 Cal.App. 235, at page 240: "While the instrument executed between the plaintiff and the city of Los Angeles is denominated a 'permit,' it is not, as plaintiff asserts, a mere license. *It grants* to plaintiff *for a fixed period the right to the exclusive use of the premises on prescribed terms.* It embodies an agreement having all of the characteristics and

qualities of a lease, and entitles plaintiff to the exclusive control and enjoyment of the premises for the full term specified, subject only to fulfillment of the terms and conditions expressed. On the termination of the tenancy improvements constructed by the occupant are to become the property of the city, but so long as plaintiff complies with its covenants, plaintiff remains secure in its possession throughout the agreed term.''. (Emphasis added.)

In line with these principles, plaintiff's continued possession of the shipyards was reasonably estimated as of the first Monday in March, 1943, to be one year. These possibilities presented themselves: (1) Plaintiff's right of possession might have been terminated immediately by action of the Maritime Commission due to plaintiff's failure to perform properly its part of the contracts; (2) plaintiff's right of possession might continue until delivery of the last of the ships as scheduled—August 8, 1944, for Shipyard No. 3, and November 16, 1944, for Shipyard No. 3-A; or (3) plaintiff's right of possession might continue for the duration of the war. Plaintiff's shipbuilding records established its ability to perform the work in question and negatived the happening of the first possibility as ground for cancellation of the contracts; and general views prevailing in early 1943 as to the war's prolongation for at least another year or two and the continued need of the United States for ships during such period would justify the one-year base period of the 1943 assessments upon plaintiff's possessory interest in the shipyards. Under such circumstances the duration estimate governing the assessments does not warrant objection.

It is true that plaintiff did not have the right to transfer its possession of the shipyards to another, but such prohibition did not remove plaintiff from the status of a lessee, for it is common practice for leases to include clauses forbidding assignment or subletting. The cases of *City and County of San Francisco* v. *Anderson,* 103 Cal. 69 [36 P. 1034, 42 Am.St.Rep. 98], and *Board of County Commissioners of Arapahoe County* v. *Rocky Mountain News Printing Co.,* 15 Colo.App. 189 [61 P. 494], wherein nontransferable memberships in voluntary associations (the San Francisco Stock and Exchange Board and the Associated Press, respectively) were discussed as a *species of personal right,* present no analogy to considerations with regard to a possessory

interest in land and improvements, which historically have been regarded as "property" for tax purposes. Nor, as plaintiff urges, is this case "indistinguishable" from the situation in *Douglas Aircraft Co., Inc.* v. *Byram,* 57 Cal.App.2d 311 [134 P.2d 15], wherein was involved a contract with the War Department for the manufacture, sale and delivery of airplanes for a fixed total sum; partial payments were to be made as the work progressed; and "title to all property upon which any partial payment [was] made prior to completion of [the] contract [was to] vest in the Government in its then condition forthwith. . . ." After noting at page 316 decisions in this state "where possessory interests in exempt real property were held (or said) to be taxable," the court stated at page 317 that the company did not have in the federal government's property "a usufructuary right, that is, 'the right of using and enjoying the profits of a thing belonging to another, without impairing the substance' . . ."; that "the use which the [company] was permitted to make of the partial planes and parts was entirely for the benefit of their owner, the federal government, and not for [its own] benefit . . ."; that "the fact that the [company] was to be paid for fabricating a plane out of the government's material does not change its use of the material from a use for the government to a use for the [company]"; and accordingly, "the [company] had no possessory interest arising to the dignity of taxable property. . . ." ▮ But here no comparable assessment was levied upon plaintiff with regard to its possession of the vessels and the materials which it was fabricating into ships for the Maritime Commission. Rather, plaintiff's assessment stemmed from its use of the land and facilities in the shipyards as essential to its production of ships at a profit, a right of possession consistent with its operation as an entrepreneur in business on its own account, and not simply as a bailee or agent of the government. Under the "Vessel Construction Contracts," plaintiff was not given merely the right to perform services for the government, but it was required "as independent contractor and not as agent" to construct and deliver the scheduled vessels "at [its] own risk," to "make good, at its expense, any . . . defects" occurring "within 6 months after [the commission's] acceptance of each Vessel," to bear part of the liability for loss or destruction of any vessel during construction through

"replacement" without "adjustment . . . in the contract price," and to "be responsible for any and all claims made against the Commission or the Vessels for infringement of patent or patent rights. . . ." Such contract provisions correlated plaintiff's occupancy of the shipyards with its possession of a "usufructuary right" therein pursuant to its performance of the scheduled work under an independent profit-earning arrangement for its own benefit—a "possessory interest arising to the dignity of taxable property" under California law.

The next matter to be noted is the claim that plaintiff's possessory interest in the shipyards was without taxable value. The Revenue and Taxation Code requires that "all taxable property shall be assessed at its full cash value" (§ 401), which means "the amount at which property would be taken in payment of a just debt from a solvent debtor" (§ 110). The state Constitution authorizes local boards of equalization "to equalize the assessment of the property contained in [the] assessment-roll, and to make the assessment conform to the true value in money of the property contained in said roll . . ." (Art. XIII, § 9.) But the precise method to be used in calculating "full cash value" is not prescribed by law. To this point it was said in *Utah Construction Co.* v. *Richardson,* 187 Cal. 649, at pages 652-653 [203 P. 401]: "As a general rule, it is not essential that the legislature prescribe the method of valuation to be employed, but it may delegate to its taxing officers the power to adopt a suitable method and, in the latter case, the assessors must value the property according to their best judgment and with honest purpose. (Citing authorities.) The general requirement in the state constitution that the legislature fix the 'manner' in which the assessment is to be made does not limit the power of the legislature to invest the taxing board with the right to choose a rule of valuation. . . . 'No principle of valuation of property for purposes of taxation is prescribed by the laws of this state. The statutes define the different species of property and provide that every species shall be assessed at its "actual cash value." But, as to the mode of ascertaining the cash value, our law is silent. No subsidiary principles of valuation are laid down to guide the owner in making his statement in those cases where he is required to specify values; and the assessor is left equally unrestricted in making his estimates. *It follows that owners and assessors*

*must be guided by those general principles which everywhere determine the valuation of property,* independently of statutory rules. . . .' " (Emphasis added.)

 While for the purpose of taxation the "full cash value" of property is commonly construed to mean its "fair market value"—the value a willing purchaser will pay to a willing seller in an open market—(*Crocker* v. *Scott,* 149 Cal. 575, 592 [87 P. 102]; *City of Los Angeles* v. *Western Union Oil Co.,* 161 Cal. 204, 206-207 [118 P. 720]), the absence of an "actual market" for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that "all property . . . shall be taxed in proportion to its value" (art. XIII, § 1) but only that the assessor must then use such pertinent factors as replacement costs and income analyses for determining "valuation." (*Blinn Lumber Co.* v. *County of Los Angeles,* 216 Cal. 474, 478-479 [14 P.2d 512, 84 A.L.R. 1304]; *Hammond Lumber Co.* v. *County of Los Angeles, supra,* 104 Cal.App. 235, 244-245.) That situation frequently exists with respect to industrial properties, where their special purposes in use or their mammoth size preclude the creation of an "active market" for their disposition. So it was said in *Underwood Typewriter Co.* v. *City of Hartford,* 99 Conn. 329 [122 A. 91, at page 94], with reference to the tax assessment of a large "factory plant," which was "adapted especially to the . . . business of manufacturing typewriters" and to which the market-comparison approach to value was not feasible: ". . . the law never requires the impossible . . . if the [market value method] cannot be followed, other means must and may be found by which the assessors can perform the duty the law has put upon them. One of the means which have been approved and sometimes used is to ascertain the original cost of construction and improvements, deducting therefrom depreciation, and adding the increase in cost of materials and labor, if at the time of valuation there is such increase over the cost at the time of construction." To like effect, see *Essex Co.* v. *City of Lawrence,* 214 Mass. 79 [100 N.E. 1016, 1018], and *People ex rel. Wangelin* v. *St. Louis Bridge Co.,* 357 Ill. 245 [191 N.E. 300, 303]. Similarly, "market value is an unsatisfactory test of the value to a tenant of a leasehold interest . . . because a lease rarely has any market value . . . [usually] it is not assignable at the will of the tenant, and he pays in rent all that the right of occupation is worth." (*James McMillin Printing Co.* v. *Pittsburg, C. & W. R. Co.,* 216 Pa. 504 [65 A.

1091, 1094].) Likewise, here plaintiff's nontransferable possessory interest in the shipyards had no "market value" in conformity with ordinary concepts of valuation premised on the "sales comparison" method, and it was necessary to follow some other means of ascertaining assessment values for the property in question. (See *North American Telegraph Co.* v. *Northern Pac. Ry. Co.*, 254 F. 417, 418-419 [166 C.C.A. 49].)

The computation process used by the assessors in their valuation of plaintiff's possessory interest in the shipyards, both as to the land and improvements, is outlined above and need not be detailed with greater particularity at this point, except to note that the respective valuation methods followed have been judicially approved in cases presenting analogous considerations. (*Blinn Lumber Co.* v. *County of Los Angeles, supra,* 216 Cal. 474, 478-479; *Hammond Lumber Co.* v. *County of Los Angeles, supra,* 104 Cal.App. 235, 244-245; *Underwood Typewriter Co.* v. *City of Hartford, supra,* 122 A. 91, 94.) The assessments are not challenged here upon the basis of an overcharge in the sense that some stated but lesser amount of tax would be proper, but it is argued that plaintiff's possessory right in the shipyards was without *any* value for these reasons: "(1) The plaintiff may not sell it; (2) it is so restricted that a purchaser could derive no benefit from it even if it could be transferred; (3) the risks attached would prevent a purchaser from buying it." The first point has already been noted as without significance by reason of the character of plaintiff's property interest. ▮ The second point relates to the fact that the "Vessel Construction Contracts" correlated possession of the shipyards with a single use— "constructing . . . vessels"—and so the property was not available for general commercial purposes. But restrictions on the use of leased premises are not uncommon and such matters are taken into consideration in determining the value of the possessory right. Thus, in *Hammond Lumber Co.* v. *County of Los Angeles, supra,* 104 Cal.App. 235, the limitation "upon the use of the land to the purposes of a lumber business instead of extending a privilege for any sort of commercial use" was a factor affecting the valuation and the assessment was sustained. (Pp. 243-244.) ▮ Likewise here, as above stated, a deduction of 5 per cent of the "cash value" of the land was made by the respective assessors because of the restriction of the possessory use to shipbuilding. But no such deduction was made from the value of the improvements inasmuch as they were new and were specially designed for shipbuilding,

thus serving for their highest and best use. In the light of these observations as to limitation in the use of the property, plaintiff's possessory interest appears to have been fairly evaluated. ▮ Nor does the third point of objection relating to the "risks attached" to the continued performance of the work by virtue of the cancellation and termination clauses of the contracts nullify the taxable value estimate for plaintiff's possessory interest in the shipyards. As above analyzed, these contract provisions were correlated with the whole purport of the national emergency shipbuilding plan and designed to protect the government in that program; and the possible bases for estimating the probable term of plaintiff's possessory right were factors which the assessors considered in fixing the duration period at one year. As was said in *Hammond Lumber Co.* v. *County of Los Angeles, supra,* 104 Cal.App. 235, at page 246: "Different minds may be expected to differ honestly in their judgments. But after considering all the circumstances and the various factors influencing value, it is the assessor's duty to exercise a prudent discretion in reaching conclusions."

▮ The "Vessel Construction Contracts" provided for plaintiff to be paid stated sums for each ship built and delivered to the government, and to be reimbursed for specified costs. Nevertheless, it is contended that plaintiff's earning of profit under such arrangements has no relation to the value of the shipyards, and its right to the "exclusive use and possession" thereof, but represents simply "the fair value of [its] managerial services and organization" in the operation of the shipyards for the government's benefit. To support this theory of payment, reference is made to certain testimony offered in the trial court and rejected because not presented to the respective boards of equalization as affecting the issue of taxable value. (*Wild Goose Country Club* v. *County of Butte,* 60 Cal.App. 339, 341 [212 P. 711]; *Hammond Lumber Co.* v. *County of Los Angeles, supra,* 104 Cal.App. 235, 247.) But even assuming that plaintiff did not make any "profit" out of the shipyards as such, but only out of its "services" in performing the construction work, that fact would not negative the propriety of an assessment based on its "beneficial use" of the property as an entrepreneur engaged in the management of a business enterprise. Plaintiff had a property interest in the shipyards by virtue of its "exclusive use and possession" thereof, and after a full hearing on the issue of value, the respective boards of equalization determined that

the method pursued by the assessors was a correct mode of calculation, and that each assessment was a fair and just valuation for purposes of taxation. ▮ In reviewing the decisions of the boards, the trial court made the findings summarized above and concluded that there was evidence of sufficient substantiality before the boards to justify their finding that plaintiff's property interest was not assessed improperly, or in excess of its cash value, but only in proportion to the value of the possessory right. The record sustains such findings and conclusions, and it is therefore clear that plaintiff failed to make the showing required to entitle it to relief in this action. (*Universal Consolidated Oil Co.* v. *Byram,* 25 Cal.2d 353, 356-357 [153 P.2d 746]; *Eastern-Columbia, Inc.* v. *County of Los Angeles,* 61 Cal.App.2d 734, 745 [143 P.2d 992].)

▮ The third contention to be noted is the claim that the assessments were invalid under the federal Constitution by virtue of the settled rule that "federal property is immune from state and local taxation." As illustration of this rule, there are cited cases such as *Van Brocklin* v. *State of Tennessee,* 117 U.S. 151 [6 S.Ct. 670, 29 L.Ed. 845], where the United States had complete title to the land upon the assessment date as a purchaser at a tax sale and persons subsequently acquiring title to the land were not liable for state taxes thereon during the period the United States held title; cases such as *Clallam County* v. *United States,* 263 U.S. 341 [44 S.Ct. 121, 68 L.Ed. 328], and *Maricopa County* v. *Valley National Bank of Phoenix,* 318 U. S. 357 [63 S.Ct. 587, 87 L.Ed. 834], involving a state tax upon the property of federal instrumentalities, or *Mayo* v. *United States,* 319 U.S. 441 [63 S.Ct. 1137, 87 L.Ed. 1504, 147 A.L.R. 761], involving a state inspection fee upon an activity of the United States in its governmental capacity; and various land grant cases such as *Wisconsin Central Railroad Co.* v. *Price County,* 133 U.S. 496 [10 S.Ct. 341, 33 L.Ed. 687], *United States* v. *Rickert,* 188 U.S. 432 [23 S.Ct. 478, 47 L.Ed. 532], and *Irwin* v. *Wright,* 258 U.S. 219 [42 S.Ct. 293, 66 L.Ed. 573], declaring that alienation of United States property does not pass an interest to the vendee taxable by a state until there has been compliance with all conditions precedent for the delivery of the deed. While it cannot be disputed that "the public policy of national development and federal tax collection justify the limitation on state taxing power announced by" such cases (*S. R. A., Inc.* v. *Minnesota,* 327 U.S. 558, 569 [66 S.Ct. 749, 90 L.Ed. 851]),

they have no pertinency here with respect to a totally different factual situation as above recited.

Nor is plaintiff's position strengthened by reason of the decision of *United States* v. *County of Allegheny*, 322 U.S. 174 [64 S.Ct. 908, 88 L.Ed. 1209], cited as the "latest" example of the application of the immunity rule. In that case Mesta Machinery Company, a Pennsylvania corporation, was engaged in the manufacture of heavy machinery at its plant in Allegheny County. In October, 1940, the War Department desired to produce a quantity of large field guns. Mesta's plant was not equipped for the manufacture of such ordnance; so Mesta and the government agreed that certain additional equipment should be furnished at government cost, that title to such equipment should vest in the government upon delivery at the site of work and inspection and acceptance, and that it should remain the property of the United States. Thereupon, the required equipment was obtained, inspected and accepted upon behalf of the United States, which thereupon compensated Mesta as agreed. The machinery was then bolted on concrete foundations in Mesta's plant, on real property owned by it; and was capable of removal without damage to the building. The government leased the machinery to Mesta for an indeterminate period at the nominal rental of $1.00 a year, and Mesta was permitted to use it only for the purpose of manufacturing ordnance. Mesta could not remove any of it without permission, and at all times it was under government inspection and supervision. The agreement designated Mesta as "a bailee under a mutual benefit bailment" and obligated the United States to reimburse Mesta for any tax it should have to pay by reason of its arrangement with the government.

After the installation of the machinery, the assessing authorities of Allegheny County revised Mesta's previously determined assessment for ad valorem taxes, and added onto the value of the real estate a sum equivalent to the value of the machinery in question. The tax was sustained by the Supreme Court of Pennsylvania upon the premise that under the state law regardless of who held title to the machinery, it constituted a part of Mesta's mill for purposes of assessment and was properly assessed as real estate. The Supreme Court of the United States reversed upon the ground that since the machinery in question belonged to the United States, the assessment was improper, for "Government-owned prop-

erty, to the full extent of the Government's interest therein, is immune from taxation, either as against the Government itself or as against one who holds it as a bailee." (322 U. S. 189.) But pertinent to note in that opinion is the following language at page 185, limiting the scope of the decision to the factual situation at hand: "The assessors made no claim that the temporary presence of the Government's machinery actually enhanced the market value or the use value of Mesta's land. The Assessors simply and forthrightly valued Mesta's land as land, and the Government's machines as machinery, and added the latter to the former . . . [The machinery's] full value was ascertained and added to the base to which the annual rates would apply for county, city, borough, town, township, school, and poor purposes . . . the substance of this procedure is to lay an ad valorem general property tax on property owned by the United States." Then the court significantly continued at pages 186-187: "The trend of recent decisions has been to withdraw private property and profits from the shelter of governmental immunity, but without impairing the immunity of the State or the Nation itself. Benefits which a contractor receives from dealings with the Government are subject to State income taxation. (*James* v. *Dravo Contracting Co.*, 302 U. S. 134 [58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318].) Salaries received from it may be taxed. (*Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466 [59 S.Ct. 595, 83 L.Ed. 927, 120 A.L.R. 1466].) The fact that materials are destined to be furnished to the Government does not exempt them from sales taxes imposed on the contractor's vendor. (*Alabama* v. *King & Boozer*, 314 U. S. 1 [62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615].) . . . in all of these cases what we have denied is immunity for the contractor's own property, profits, or purchases. . . . The distinction between taxation of private interests and taxation of governmental interests, although sometimes difficult to define, is fundamental in application of the immunity doctrine as developed in this country. . . . Mesta has some legal and beneficial interest in this property. It is a bailee for mutual benefit. Whether such a right of possession and use in view of all the circumstances could be taxed by appropriate proceedings we do not decide. . . . But . . . here . . . the State has made no effort to segregate Mesta's interest and tax it. The full value of the property, including the whole ownership interest, as well as whatever value proper

appraisal might attribute to the leasehold, was included in Mesta's assessment.''

Implicit in this language is the proposition that had there been an attempt by the assessing authorities of Allegheny County to segregate Mesta's possessory interest in the machinery from that of the United States, the tax on Mesta's interest would have been upheld. Such is the precise situation here where the assessments in question were premised upon the valuation of plaintiff's possessory interest in the shipyards as distinguished from any property interest of the United States therein. Thus, as of March 1, 1943, according to the computation schedule as above outlined, the value of the improvements was estimated as $10,702,890 and the value of the land as $376,095, or a total of $11,078,985, but plaintiff's possessory interest therein was evaluated at $1,612,400. In so segregating the separate interests of the owner and the possessor of the property and not resting the assessments against the latter upon ''the full value of the property,'' a ''proper appraisal'' of plaintiff's right to ''exclusive use and possession'' of the shipyards for the year in question appears to have been made; and the fact that the economic burden of the tax will be borne ultimately by the government does not invalidate it. (*James* v. *Dravo Contracting Co.,* 302 U. S. 134, 160 [58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318] ; *Alabama* v. *King & Boozer,* 314 U. S. 1, 14 [62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615] ; *United States* v. *Allegheny County, supra,* 322 U. S. 174, 189. The ''immunity rule'' therefore furnishes no justification for exempting plaintiff's private possessory interest in the shipyards from bearing its fair share of taxes for the support of local government.

Finally, challenge is made of the validity of that portion of the assessments relating to plaintiff's possessory interest in the facilities in Shipyard No. 3-A, upon the premise that such facilities, according to the terms of the lease of the land on which they were erected, constituted personal property, and a possessory interest therein would not be taxable under California law. Accordingly, reference is made to the statutory definition of ''possessory interests'' as embracing the ''possession of, claim to, or right to the possession of land or improvements'' (Rev. & Tax. Code, § 107) and the provision that ''improvements'' include ''all buildings, structures, fixtures, and fences erected on or affixed to

the land'' (Rev. & Tax. Code, § 105). But the record does not show that the possessory interest in the facilities in question was assessed upon any other basis than as a possessory interest in improvements to realty, and such classification is not open to dispute under the physical facts.

The facilities in Shipyard No. 3-A, like those in Shipyard No. 3, included property of a substantial nature, such as concrete basins, piping and wiring, corrugated iron buildings, frame buildings, concrete buildings, gates and fences, ways, docks and piers, lean-to sheds and portable buildings, platforms, tracks and runways, utility buildings, machinery and equipment, paving and railroad tracks. Plaintiff did not produce either before the respective boards of equalization or the trial court any specific testimony bearing on the nature of this property—its size and manner of attachment to the land—and refuting its classification according to outward appearances and physical considerations as ''improvements'' to realty. On the contrary, it appears from the evidence before the boards of equalization that one of plaintiff's own witnesses, the executive assistant to its general manager, admitted that all of the equipment included as improvements for tax purposes was ''an integral part of the operation of the'' shipyards, thus constituting ''a unit for use together'' and giving to it the character of ''improvements to realty'' for tax purposes. (*Southern California Telephone Co.* v. *State Board of Equalization,* 12 Cal.2d 127, 138 [82 P.2d 422].) The sole basis of the argument for tax exemption of plaintiff's possessory interest in the facilities in Shipyard No. 3-A, as distinguished from substantially identical facilities erected on the government-owned land of Shipyard No. 3 and assessed as ''improvements to realty,'' is plaintiff's leasing arrangement with Santa Fe Land Improvement Company, owner of the land of Shipyard No. 3-A. The lease provided that the facilities in Shipyard No. 3-A should ''remain the exclusive property of the Government, with full right to construct, extend, alter or remove . . . at will'' and that the government should have the right to remove them at any time within 90 days after termination of the lease. The lease was recorded prior to the first Monday in March, 1943, and the assessors were so advised before the assessments were made.

But the terms of the lease relative to the government's right to remove the facilities in Shipyard No. 3-A did not fix their status as personalty for tax purposes and preclude the as-

sessors, though having knowledge of such private arrangement of the parties, from classifying such property as "improvements to realty" in accordance with the physical facts of their annexation to the land. It was so held by this court in the recent case of *Trabue Pittman Corp. Ltd.* v. *County of Los Angeles,* 29 Cal.2d 385 [175 P.2d 512], where the taxable status of banking fixtures installed by the lessee bank on the leased premises was considered. The lease provided that the lessee had the right to "remove all or any part of the [trade] fixtures . . . business equipment and all other improvements . . . placed . . . on [the] premises" (pages 388-389) and prior to the fixing of the assessment in question, "the bank had notified the county assessor in writing of its claim that the vault door and other banking equipment were personal property belonging to it and should not be assessed to plaintiff landlord as constituting a part of the improvements." (Page 390.) In holding that such property was nevertheless properly classifiable as "improvements to realty" for tax purposes, this court stated at page 397: ". . . the agreement of the parties, whether express or implied, is not binding upon the taxing authorities. (Citing cases.)" That decision is premised upon "the interest of uniformity of taxation," which can prevail "only to the extent that there is a uniform classification of real and personal property" (page 392), and the same considerations operate here to sustain the assessments upon plaintiff's possessory interest in the facilities in Shipyard No. 3-A. To the extent that the case of *Oroville-Wyandotte Irrigation District* v. *Ford,* 47 Cal.App.2d 531 [118 P.2d 340] (no petition for hearing filed in this court), though involving a distinguishable factual situation, contains language to the effect that when recorded, a private agreement fixing the legal character of property is binding upon the assessor, it must be disapproved.

The judgments are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Traynor, J., concurred.