[Civ. No. 39014. Second Dist., Div. Four. Dec. 21, 1972.]

METROPOLITAN STEVEDORE CO., Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

John D. Maharg, County Counsel, De Witt Clinton and Alfred Charles De Flon, Deputy County Counsel, for Defendants and Appellants.

Cooper, White & Cooper, W. Ronald Ingram and Alan C. Freeland for Plaintiff and Respondent.

## OPINION

**FILES, P. J.**—This is an appeal from the judgment in five consolidated actions brought to recover property taxes which had been based upon the assessment of plaintiff's possessory interest in a pier in Long Beach Harbor for the years 1965 through 1969.

The complaints filed for the years 1965, 1966 and 1967 originally stated a claim based upon the allegation that plaintiff did not own or possess any taxable property in the county. The complaint to recover 1968 taxes filed on February 5, 1969, alleged an additional ground that assessments had not been made against persons similarly situated and therefore the assessment against plaintiff was a denial of equal protection. On January 9, 1970, the complaints in the first three actions were amended to include the allegation that assessments had not been made against persons similarly situated. The complaint to recover 1969 taxes, filed January 21, 1970, was similar to the complaint to recover 1968 taxes.

At the trial (which commenced November 5, 1970) plaintiff conceded for the purpose of these cases that its interest was a taxable possessory interest.[1] Further, plaintiff made no attack upon the value given to this property by the assessor. The case was tried solely upon plaintiff's theory that it had been denied equal protection of the laws, in that its property had been singled out for assessment whereas similar interests of others had not been assessed or taxed.

After a trial without a jury the court made detailed findings which were to this general effect: on the lien date in each of the years 1965 through 1969 plaintiff possessed certain property located in the Port of Long Beach, owned by the City of Long Beach, and that plaintiff's right to use this property was created pursuant to a series of preferential assignment agreements between

---

[1]Under these circumstances we do not determine whether plaintiff's interest was taxable under the law as it stood at the times involved here.

plaintiff and the city. The court further found that 32 other preferential assignment agreements were in effect at either the Port of Long Beach or the Port of Los Angeles during some or all of the years in question; that the assessor acquired knowledge of these agreements at various times but intentionally omitted most of such interests from the assessment rolls for most of this period "with the express purpose of awaiting the outcome of the present litigation before taking any such action"; and that although the assessor, upon the advice of the county counsel, made escape assessments in 1969 and 1970, some of the interests could not be taxed because of the assessor's delay.

The trial court concluded that the assessor's conduct during this period, as detailed in the findings, constituted "intentional discrimination against plaintiff and a denial of plaintiff's right to equal protection of the laws within the meaning of the Fourteenth Amendment of the Constitution of the United States and the corresponding provisions of the Constitution of the State of California." The court awarded plaintiff a judgment for the full amount of the taxes paid during the five years in issue amounting to $125,526.08, plus interest.

The county is appealing from that judgment.

Before analyzing the evidence which was received on the issue of discrimination, it is useful to review briefly the legal principles upon which plaintiff's tax was based.

Article XIII, section 1 of the California Constitution requires that except as otherwise provided all property in the state, not exempt under the laws of the United States, shall be taxed in proportion to its value. Among the many kinds of property which are subject to taxation is a possessory interest in real property, which is defined (Rev. & Tax. Code, § 107) as "Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person." A mere license or permit to use real property ordinarily does not give the licensee a taxable interest. The test to be applied in determining whether a taxable possessory interest has been created was set forth in *Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610, 619 [184 P.2d 879], as follows:

" 'The test . . . "whether an agreement for the use of real estate is a license or a lease is whether the contract gives *exclusive possession of the premises against all the world, including the owner,* in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license, and this is a question of law arsing out of the *construction of the instrument.*" ' (Emphasis added.)"

A possessory interest must be assessed by the same standard of value as other property. (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 562 [290 P.2d 544].)

Prior to the trial of this action there had not been, so far as the briefs disclose or this court is aware, any court decision as to whether a person holding a "preferential assignment" of harbor facilities held a taxable possessory interest. Nor was there at that time any statutory guide.[2]

The evidence in this case showed that plaintiff was in the business of loading ships with various bulk dry commodities on behalf of the owners of such goods. In 1962 plaintiff entered into a five-year "lease and preferential assignment agreement" with the City of Long Beach covering certain premises on Pier G in Long Beach Harbor. The city agreed to construct and lease to plaintiff a bulk loading facility on the premises in accordance with plans furnished by plaintiff. The agreement also granted to plaintiff "preferential assignment" of berths 212 and 213 for mooring vessels. On February 14, 1965, this agreement was superseded by one entitled "preferential assignment agreement" for a term of three years. By this agreement the city granted to plaintiff "a preferential assignment for the wharf and additional contiguous wharf premises, together with the mechanical ship bulk loader and the facilities located thereon, and described as Berths 212 and 213" for the purpose of assembling, stockpiling, loading and unloading goods.

The 1965 agreement further provided "that the right hereby granted to use said premises shall not be exclusive; and whenever said premises, or any part thereof, are not required in whole or in part for the uses permitted hereunder, the General Manager of the Long Beach Harbor Department shall have the right to and may make temporary assignments to any other person. . . ."

---

[2]Revenue and Taxation Code section 107.4, first enacted in 1970 and effective in 1971, now provides: "For purposes of section 107, 'possessory interest' shall not include the possession of, claim to, or right to the possession of any berth, wharf, dock, pier, or similar harbor facility owned by a city, city and county, county or harbor or port district, if such possession, claim, or right is granted for nonexclusive use of such berth, wharf, dock, pier, or similar harbor facility. Any nonexclusive possession, claim, or right described in this section shall not be subject to property taxation.

"If the possession of, claim to, or right to the possession of, any such berth, wharf, dock, pier, or similar harbor facility is, in fact, exclusive, it shall be subject to property taxation, regardless of the manner in which such possession, claim, or right is created.

"As used in this section, a 'nonexclusive possession, claim, or right' means a right to the use of a specific berth, wharf, dock, pier, or similar harbor facility, when such specific facility is also used intermittently by others, even though such possession, claim, or right to use such facility is paramount to any use by others.

"As used in this section, a 'nonexclusive possession, claim, or right' includes a right to the use of a specific berth, wharf, dock, pier, or similar harbor facility, when the owner reserves the right to assign to others the right to use such facility."

Subsequently plaintiff entered into new "preferential assignment" agreements covering the same premises for one-year terms in 1966 (expressly superseding the 1965 agreement) and 1967 and for a three-year term commencing in 1968.

An important part of plaintiff's business on these premises consisted of stockpiling iron ore and iron pellets which were shipped by rail to the pier to be loaded into ships. Petroleum coke was also stored there for shipping. While such commodities were stockpiled, it was not feasible for other persons to use the premises assigned to plaintiff. In 1965 two ships were placed at berth 212 for purposes other than plaintiff's business. Those two ships simply discharged automobiles which were driven off under their own power. No other use of the premises assigned to plaintiff was made, except by plaintiff, from 1965 to the time of trial.

The evidence relied upon for the factual basis of the discrimination claim consisted entirely of the testimony and written interoffice memoranda of the personnel of the assessor's office. It is necessary to review that evidence to determine to what extent it supports the conclusion that there was discrimination of constitutional significance.

Prior to 1965 the assessor regarded plaintiff's interest as a taxable possesory interest, and assessed it accordingly. Prior to 1965 the assessor was aware that various other persons used harbor facilities under "preferential assignment" agreements, but he regarded those uses as nontaxable because the interests granted were nonexclusive.

Mr. Simeon Roach, a principal appraiser in charge of possessory interest assessment, testified that in the assessor's view, the test of a possessory interest was exclusivity. When plaintiff changed the form of its agreement with the city on February 15, 1965, there appeared to be no change in the actual use of the property. Mr. Roach knew that the property was being used for stockpiling, and therefore couldn't be used by other persons so long as plaintiff continued to conduct its business as it had in the past. He testified, "I felt that this was really a device to avoid taxation because the interests had not changed. . . ." As of 1965 the assessor regarded plaintiff's situation as unique. In making the 1965 assessments the assessor included the value of plaintiff's interest in the premises just as in previous years.

Plaintiff paid its 1965 taxes under protest. After its petition to the county tax appeals board was denied, plaintiff filed the first of these actions on February 26, 1966.

In 1966 and 1967 another bulk loading facility was operated under a preferential assignment agreement by American Bulk Loading Enterprises

(ABLE). The assessor assessed both plaintiff and ABLE for those years. ABLE filed suit for refund, and the case was settled by a partial refund pursuant to an order of the board of supervisors, acting on the advice of the county counsel.

In the middle of 1967, the assessor's office conducted a survey of harbor preferential assignment agreements to determine if there were any which created taxable possessory interests. Their conclusion was that two more interests were taxable, those belonging to Catalina Terminals, Inc., and Consolidated Marine, Inc. Mr. Roach testified that this conclusion represented a change in their thinking. Originally, the assessor's office had believed that complete and factual exclusivity was necessary, but their new theory as of 1967 was that a substantial exclusivity and a term agreement would be enough to create a taxable interest.

In September 1967, the assessor decided to defer any assessment of those two interests and await the outcome of the pending litigation with plaintiff. A similar decision was made with respect to the further assessment of ABLE. Mr. Roach testified that although he personally had no doubt about the propriety of the assessments of plaintiff's interests, he was aware that no court had ever held that a preferential assignment was taxable, that there were differences of opinion within the office, and that the matter was in litigation, which necessarily created a doubt as to what the outcome would be. The assessor also took into consideration a report from the county counsel that plaintiff's case would be decided in the trial court around the end of 1968, and the assessor noted that escape assessments could be made after that if the court decision was favorable.

As a result of this decision by the assessor, plaintiff was the only holder of a preferential assignment to be assessed on the 1968 and 1969 rolls.

On June 18, 1969, a deputy county counsel wrote a letter to the assessor's office stating that he was engaged in the defense of the cases brought by plaintiff, which was contending it had been denied equal protection in that other persons owning similar property interests had not been assessed.[3] The letter stated "My investigation has disclosed other substantial possessory interests in the Long Beach and Los Angeles Harbors, similar to those held by Metropolitan, which were not assessed." He referred particularly to the interests of Catalina Terminals, Inc., Sea-Land of California, Inc., American Bulk Loading Enterprises, Matson Terminals and "possibly National

---

[3]So far as the record here shows, plaintiff had not raised that contention prior to the filing of its complaint to recover 1968 taxes on February 5, 1969, and had not amended its three previous complaints to include that allegation until January 9, 1970.

Gypsum." The writer urged "In all appropriate cases I believe that escape assessments should be made. . . . If such is not done I believe the outcome of our Metropolitan cases will be seriously jeopardized."

Pursuant to that advice the assessor made an intensive study of preferential assignments in the harbor area, following which escape assessments were made for a number of persons for the years 1965 through 1969. No one was intentionally omitted at that time.

■ Under the equal protection clause of the Fourteenth Amendment to the federal Constitution, a taxpayer may be entitled to relief against arbitrary discrimination practiced by the taxing entity or its officers. (See *Raymond* v. *Chicago Union Traction Co.* (1907) 207 U.S. 20 [52 L.Ed. 78, 28 S.Ct. 7]; *Sioux City Bridge Co.* v. *Dakota County* (1923) 260 U.S. 441 [67 L.Ed. 340, 43 S.Ct. 190, 28 A.L.R. 979]; *Cumberland Coal Co.* v. *Board of Revision* (1931) 284 U.S. 23 [76 L.Ed. 146, 52 S.Ct. 48]; *Iowa-Des Moines National Bank* v. *Bennett* (1931) 284 U.S. 239 [76 L.Ed. 265, 52 S.Ct. 133]; *Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303, 315 [217 P.2d 936].) The common characteristic of these cases is that an assessment pattern had been established, and a single property owner or small group had been assessed arbitrarily on a more onerous basis. Those discriminated against were given the benefit of the standard established for the others, even though that standard was in some cases below what the statute called for.

On the other hand, discrepancies arising from the assessor's mistake or lack of information do not raise any constitutional issue. (See *Sacramento Mun. Util. Dist.* v. *County of El Dorado* (1970) 5 Cal.App.3d 26, 36 [84 Cal.Rptr. 748]; *Millbrook Farm* v. *Watson* (1968) 264 Cal.App.2d 512, 517 [70 Cal.Rptr. 745].)

■ The judgment of the trial court here under review appears to be based upon plaintiff's theory that the assessor's failure to assess all known holders of preferential assignment agreements established a pattern of zero assessments for such persons, and that plaintiff is therefore entitled to escape taxation entirely on its interest.

Plaintiff's theory in the trial court rested upon the assumption that all persons who had entered into a written agreement called "preferential assignment agreement" for the use of harbor property constituted a separate class for the purpose of assessment and all members of that class should be assessed alike. That theory is undermined by two basic omissions in its evidentiary foundation: *First,* it does not appear that all preferential assignment agreements are alike. The only evidence on the subject is that there are differences. *Second,* in the assessor's view, the taxability of the interest

was not shown by the terms of the agreement alone, but depended in part upon how the assignee used the described premises. The evidence showed not more than one assignee, other than plaintiff, who ever used its assigned premises in the way plaintiff operated.

The evidence showed, and the trial court found, that 33 preferential assignment agreements existed in the harbor area. None of those agreements was offered in evidence except those to which plaintiff was a party. Plaintiff's agreements do not on their face disclose that plaintiff was to be a full time occupant of the premises described in the agreement. It was only by observing the way in which plaintiff operated that the assessor was able to conclude that plaintiff enjoyed continuous and exclusive possession of the wharf. By contrast, a shipping company might exercise its rights under such an agreement by using the wharf to load and unload ships as they came and went, relinquishing it to others the rest of the time. The assessor's appraisers, who are the sole source of evidence in the record on this subject, testified that there were differences in the terms of the agreements, and differences in the manner in which the parties operated their businesses.

It is necessary to have in mind that neither the tax statutes nor the assessor treated preferential assignment agreements as a separate category of property. Persons using harbor property under such agreements were assessed only if it appeared to the assessor that the assignee actually held a possessory interest in the described premises. The leading case of *Kaiser Co.* v. *Reid, supra,* 30 Cal.2d at page 619 had stated that whether an agreement conferred exclusive possession was "a question of law arising out of the construction of the instrument." Preferential assignment agreements, read literally, do not provide for exclusive possession by the assignee, but in 1965 the assessor for the first time decided to look beyond the writing and assess an assignee who was in fact enjoying exclusive occupancy of a wharf.[4]

The assessor had no precedent for this approach, but felt justified in assessing plaintiff because he saw that plaintiff was continuing to occupy the premises exactly as it had in the past when a lease was in effect. No other holder of a "preferential assignment agreement" fitted that pattern.

The testimony is clear and uncontradicted that the assessor had begun to change his thinking in 1967 and 1968; and that his opinion changed again in 1969 and 1970, as he concluded that something less than continuous exclusive possession could be relied upon to establish that the assignee enjoyed something which might be assessed as a possessory interest.

---

[4]In view of the concession made by plaintiff in the trial court, mentioned above, we do not pass upon the propriety of this assessment.

The only preferential assignee which the assessor believed had the same degree of possession as plaintiff was ABLE, which was assessed for 1966 and 1967. ABLE sued for refund for those two years, and the claim was compromised by refunding $22,778.31, leaving a net tax of $8,023.03. One reason for the settlement was the taxpayer's contention that its occupancy did not commence until after the lien date in 1966. The record does not show what the contentions were with respect to the 1967 tax. No finding of discrimination can be based on the simple fact that that litigation was compromised.

The only assignees which the assessor intentionally omitted, though believing them subject to tax, were Catalina and Consolidated, commencing in 1967, and ABLE, commencing in 1968. He did so because he was in doubt as to whether the courts would agree that any preferential assignment could be taxed as a possessory interest, and he wished to await the trial court's decision in this case, which, he was advised, would probably come during 1968. This decision by the assessor, relating to only three taxpayers, though "discriminatory" in one sense of the word, does not establish the kind of pattern or standard of assessment that the courts should apply to all other property owners under the equal protection clause.

Plaintiff contends that the escape assessments made in 1969 and 1970 for earlier years are evidence of additional discrimination, both because they were made late, and because the assessor calculated the value of those interests on a basis different from the basis on which he calculated plaintiff's interest. The record does not support that inference.

The uncontradicted testimony of the assessor's appraisers is that the persons assessed in 1969 and 1970 (except for ABLE) were in a different position from plaintiff.[5] In assessing those assignees not in continuous exclusive possession, the assessor used a formula which he felt would properly value the economic interest which the assignee had. The record does not contain any evidence that the amount of the escape assessment for any assignee was a lower proportion of the value of the property than the proportion at which other property owners in the county (including plaintiff) were assessed. Thus the trial court had no basis for finding that any escape assessment was too low.[6] (See *Schwarz* v. *County of Marin* (1969) 271 Cal.App.2d 120 [76 Cal.Rptr. 207].)

Two cases relied upon by plaintiff require comment.

---

[5]Compare the guidelines subsequently enacted in Revenue and Taxation Code section 107.4, quoted in footnote 2.

[6]Plaintiff does not contend that the amount of its assessment was higher than the standard used for the county generally.

In *Mahoney* v. *City of San Diego* (1926) 198 Cal. 388 [245 P. 189], the evidence showed that the assessor had adopted a policy of assessing land at 80 to 100 percent of its full cash value and improvements at not to exceed 25 percent of cash value. The court held the assessments on the plaintiffs' land to be void, and affirmed a judgment for repayment of the taxes which they had paid.

In *Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303, the assessor classified vault doors and counterlines used by banks as real property, and classified such property used by all other persons as personalty. An earlier decision had established that vault doors and counterlines were real property for tax purposes. Nevertheless, special assessment district charges which were levied only upon real property were held invalid to the extent they represented a tax on fixtures installed in bank buildings.

In each of those cases the assessor had established a standard or pattern, and had failed to apply that standard uniformly—hence the invalidity of the tax imposed upon the victims of the discrimination. But we cannot equate the assessor's conduct in the case at bench with the establishment of a standard. His failure to assess ABLE, Catalina and Consolidated during certain years was no more than a pragmatic decision arising out of his uncertainty as to how the courts would treat the varying fact situations which appeared among the holders of preferential assignment agreements.

In *Simms* v. *County of Los Angeles, supra,* 35 Cal.2d at page 316 the Supreme Court said: "Actions to recover taxes paid under protest are equitable in nature. [Citations.] It is the established rule, based on the maxim that he who seeks equity must do equity, that a property owner seeking to challenge the validity of a tax must pay or offer to pay the portion of the tax to which the taxing authority is entitled in equity and good conscience. This rule is applicable in actions to recover taxes erroneously collected or paid under protest."

There is not the slightest equity in plaintiff's demand that its taxes over a five-year period be rebated. So far as can be determined by the record here, plaintiff has been assessed on exactly the same basis as every other property owner in Los Angeles County, with the possible exception of three other firms concerning whose taxability the assessor was unsure. If this is discrimination, plaintiff is no worse off than every property owner in the county who paid his taxes without question. To give plaintiff a refund would only exacerbate the inequality for everyone else. (See *Jones Lbr. Co.* v. *Del Norte County* (1967) 251 Cal.App.2d 645 [59 Cal.Rptr. 644].)

There is another reason why plaintiff cannot prevail on its claims for refund of 1967, 1968 and 1969 taxes. Although plaintiff did file a petition

for equalization with the Los Angeles County Tax Appeals Board for the years 1965 and 1966, there is no allegation or proof that it did so for the years 1967, 1968 and 1969. By reason of its failure to exhaust its administrative remedies for those years it is barred from judicial relief. (*Security-First Nat. Bk.* v. *County of L. A.* (1950) 35 Cal.2d 319 [217 P.2d 946]; *Dawson* v. *County of Los Angeles* (1940) 15 Cal.2d 77, 81 [98 P.2d 495]; *Luce* v. *City of San Diego* (1926) 198 Cal. 405 [245 P. 196].)

The judgment is reversed.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied January 8, 1973, and respondent's petition for a hearing by the Supreme Court was denied February 14, 1973.