[Civ. No. 25764.   Second Dist., Div. Three.   Aug. 24, 1962.]

LOCKHEED AIRCRAFT CORPORATION, Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

Harold W. Kennedy, County Counsel, John D. Cahill and A. R. Early, Deputy County Counsel, for Defendants and Appellants.

O'Melveny & Myers, Bennett W. Priest and Richard B. Ragland for Plaintiff and Respondent.

FILES, J.—This is an appeal from a judgment awarding to plaintiff $272,053.61 plus interest as a refund of personal property taxes for the year 1954. The contested tax was based upon the value which the county assessor placed upon the plaintiff's work-in-process inventory.

The evidentiary facts are not in dispute. On the assessment date, March 1, 1954, plaintiff was engaging in the business of manufacturing the series of commercial airplanes known as Constellations. As of that date 279 planes had been delivered and 99 were on hand partially complete. Plaintiff used what was called the "constant cost" or "standard costing" method of valuing its inventory of uncompleted Constellations. This accounting method was adopted because in the manufacture of a series of airplanes there is a great variation between the cost of manufacturing the first of the series and the cost of manufacturing the later units. When a model first goes into production there is much costly trial-and-error experimentation. As more units go down the assembly line more efficient production techniques are developed and costs are reduced. Thus in the manufacture of the 1049G series (which was a portion of the Constellation series) 273,140 labor hours were required on the assembly line to produce the first unit, 157,002 hours to manufacture Number 20, 109,404 hours for Number 50, and approximately 95,000 hours for each unit beginning with Number 80. The decline is not constant because as variations are introduced into a series, costs will go up, and then diminish as further experience is gained.

Each of the planes of a particular series, when completed, has approximately the same value as the others and is expected to sell for approximately the same price. Thus if the manufacturer kept its profit and loss records on the basis of the actual labor devoted to each plane, the company would show heavy losses during the early part of the program and correspondingly high profits during the later period. The constant cost method serves to level out these fluctuations in the profit and loss statement. Under this method the labor and material costs incurred for each airplane, as it is being built, together with a certain allocation of overhead or indirect costs, are accumulated in an inventory account called work-in-process. When a completed plane is sold and delivered the work-in-process account is relieved by a standard amount, which may be more or less than the costs which went into the account for the manufacture of that plane. This standard amount, which is charged as the cost of the plane in the cost of goods sold account, is based upon the estimated average cost of all of the planes in the series.

Thus, if the first plane in the series results in charges totaling $2,000,000 in the work-in-process account, and if this account is then relieved by a ''standard'' cost of $1,500,000 which is entered in the profit-and-loss accounts as the cost of the plane, there remains in the work-in-process account a balance of $500,000 which is sometimes referred to as ''excess cost.'' During the early part of a manufacturing program this ''excess cost'' builds up in this inventory account until the point is reached where the ''actual'' cost of each unit (i.e., the labor, materials and overhead charged to work-in-process) is less than the standard cost. Thereafter the ''excess cost'' is amortized as the standard cost removed from the work-in-process account exceeds the ''actual'' cost charged for each unit. Ideally, if the standard cost is accurately estimated, all of these ''excess costs'' will be removed from the work-in-process account as the last plane in the series is completed and sold.

Plaintiff's use of this constant cost method of valuing work in process was approved by the Internal Revenue Service, by the Securities and Exchange Commission and by the independent certified public accountants who audited plaintiff's books.

The record here shows that when the county assessor made his 1954 assessment of plaintiff's personal property from the plaintiff's books of account, he did not inspect or make any

physical inventory of plaintiff's work in process. He found that the total personal property of plaintiff at its Burbank plant, including work in process, was valued on the company's books at slightly under $50,312,000. He concluded that the market value of these assets was 90 per cent of book value. He then assessed the property at 50 per cent of market value, or $22,640,370.*

In making this assessment the assessor had unlimited access to the books and records maintained by plaintiff. At the time the assessor made his examination in 1954 he was informed that plaintiff used the constant cost method of valuing its work in process with respect to its Constellation program, and that the work-in-process account contained ''excess costs'' in some amount. Plaintiff at that time informally requested the assessor to deduct these ''excess costs'' in appraising the work-in-process inventory. However, the amount of the ''excess costs'' of the Constellations in the work-in-process account had not been computed by anyone and could not be determined except through study and elaborate computation from existing records. The trial court found that the books and records of plaintiff ''reflected on their face that the excess costs of such property no longer owned by plaintiff were therein contained.'' This finding is supported by the evidence only in the qualified sense that records existed from which it was possible, by analysis and computation, to determine the dollar value of labor and materials which went into the assembly of each Constellation separately. It is undisputed that as of the time the assessment was made, neither the assessor nor the plaintiff's personnel knew what portion of the work-in-process account was made up of ''excess costs'' of the Constellation program.

Plaintiff did not in the year 1954 make any application to the board of supervisors, sitting as a board of equalization, for a change in this assessment. On December 9, 1954, the tax was paid without any protest.

Early in 1955 plaintiff caused an analysis of its work-in-process account to be made. After four months of study plaintiff concluded that this account had included, as of March 1,

*The trial court found that ''Plaintiff's book figures were reflected directly on the assessment roll by the application of an 'equalization' rate of 45%.'' Although this method would result arithmetically in the same figure, it is not in accordance with the uncontradicted evidence as to how the appraiser made his appraisal. The use of the 45 per cent figure obscures the fact that the assessor considered the market value of the inventory to be 90 per cent of its book value.

1954, $9,676,739 of "excess costs"—i.e., the amount by which the labor and materials expended in constructing the completed Constellations exceeded the standard cost set up on the books for such planes.

On October 30, 1957, plaintiff filed with the board of supervisors a petition for refund of $272,053.79. This was the difference between the tax which was paid and the tax which would have been payable if the assessor had not included 45 per cent of this $9,676,739 in the assessed valuation. The petition was denied. Thereafter this action was begun under the provisions of sections 5096 to 5107, inclusive, of the Revenue and Taxation Code. Plaintiff relied upon section 5096, subdivision (b), which provides that taxes shall be refunded if they were "Erroneously or illegally collected." Initially plaintiff contended also that the taxes were refundable on the ground of clerical error (under subd. (c) of § 5096) but this ground of clerical error was expressly abandoned at the trial. The action was tried without a jury. The court found that the book figure of personal property of plaintiff which the assessor had used in 1954 included $9,676,739 of "excess costs" of Constellation airplanes no longer owned by plaintiff, and that the assessment therefore, to the extent of $4,354,532 (45 per cent of $9,676,739), "did not represent tangible or intangible property owned, claimed, possessed or controlled by plaintiff on the first Monday in March, 1954." The judgment was for an amount equal to the tax on $4,354,532.

A taxpayer who is aggrieved by an overvaluation of his property has an administrative remedy in the form of an application to the board of supervisors, which sits on the first Monday in July as a board of equalization, to lower the assessment. (Cal. Const., art. XIII, § 9; Rev. & Tax. Code, § 1601 et seq.) ■ It is the general rule that a taxpayer is not entitled to judicial relief from an erroneous assessment unless he has exhausted the administrative remedy. (*Security-First Nat. Bank* v. *County of Los Angeles*, 35 Cal.2d 319 [217 P.2d 946].) ■ However, a distinction exists "between the wrongful assessment of property not subject to taxation and the wrongful valuation of taxable property." (See *Luce* v. *City of San Diego*, 198 Cal. 405, 406 [245 P. 196].) If, as plaintiff contends, the county has taxed property which the taxpayer does not own, there is no question of valuation which must be presented first to the board of equalization for correction as a condition for judicial relief. (*Parr-Richmond Industrial Corp.* v. *Boyd*, 43 Cal.2d 157, 165 [272 P.2d 16].)

Plaintiff's ability to maintain this action turns, therefore, upon whether the assessment in question was a valuation (whether correct or incorrect in amount) of the partially completed Constellations which plaintiff owned on the tax day or whether it was an assessment upon Constellations which had been previously sold.

The trial court made a finding of fact that the assessment "to the extent of assessed value of $4,354,532 was and is an illegal assessment of personal property not owned, claimed, possessed or controlled by plaintiff. Said assessment was not a mere over-valuation of personal property owned by plaintiff and located on the premises." This "finding" is necessarily grounded upon the trial court's conclusion as to the legal effect of using a percentage of the book value of plaintiff's work-in-process account as the "actual cash value" of the work in process for tax purposes. The details of plaintiff's accounting system and the manner in which the assessor made his appraisal are set forth in the evidence without conflict. This is not a case in which the trial court was required either to weigh conflicting evidence or to draw factual inferences from equivocal circumstances. It is necessary to examine this record to determine whether the evidentiary facts will support the trial court's conclusion.

Defendants argue that plaintiff's theory is not entitled to consideration because the assessment roll shows only that the assessor assessed "personal property" at 2555 North Hollywood Way, Burbank. Defendants suggest that since plaintiff admittedly owned some personal property at that address, the court is precluded from inquiring as to what property was assessed because "the assessment roll when completed and certified to the board of supervisors is the *only* evidence of the acts and intentions of the assessor," citing *People* v. *San Francisco Savings Union,* 31 Cal. 132, 137; *People* v. *Stockton etc. R.R. Co.,* 49 Cal. 414, 421; *Savings & Loan Soc.* v. *City & County of San Francisco,* 146 Cal. 673 [80 P. 1086]; and *Spring Valley Water Co.* v. *County of Alameda,* 24 Cal.App. 278 [141 P. 38].

The *Stockton Railroad* and the *Savings and Loan* cases both involved changes made by the assessor before the assessment roll was in its final form, and the decisions hold that the court was concerned only with the correctness of the entry which finally appeared on the roll. In the *Savings Union* case the assessor neglected to use a dollar sign, and the court held that parol evidence could not be received to show that figures on

the assessment roll were intended to indicate dollars. In the *Spring Valley Water* case the assessor assessed certain riparian lands, and made a separate assessment of the riparian rights appurtenant to this land. The latter assessment was held to be void as double taxation because the water rights were a part of the land and includable in the value of the land. The county attempted to prove that in appraising the land the assessor had excluded the water rights so that there was no double assessment in fact, but the court held such evidence to be inadmissible ''on the ground that parol evidence is not admissible to vary or affect the written record of the assessment.'' (24 Cal.App. at p. 284.)

No case has been brought to our attention wherein this parol evidence rule was applied to prevent a taxpayer from showing that a general description of his property on the assessment roll included property interests which were not proper subjects of taxation. In cases where the taxpayer asserted he was being assessed on property not subject to tax the courts have not expressed any concern as to whether it is necessary to look beyond the assessment roll to determine the basis of the assessor's figure.

Where an assessor has lumped together exempt and nonexempt property, or included nonexistent property in his basis of valuation, the courts have not hesitated to order a proportionate refund of the tax. In *Brenner* v. *City of Los Angeles,* 160 Cal. 72 [116 P. 397], an assessment was made upon real property which was subject to a mortgage in favor of the regents of the University of California. The amount of the mortgage was exempt. The full value of the property was assessed to the owner, without deduction for the mortgage. The Supreme Court determined this to be an illegal tax upon nontaxable property and affirmed a judgment for a refund.

In *Third & Broadway Bldg. Co.* v. *County of Los Angeles,* 220 Cal. 660 [32 P.2d 377], a building was assessed at its entire value although 70 per cent of it was exempt because occupied by a public utility under lease. The tax was held to have been collected on exempt property, to the extent of 70 per cent, and the owners of the building recovered that proportion of what had been paid.

In *Pacific Coast Co.* v. *Wells,* 134 Cal. 471 [66 P. 657], the taxpayer inadvertently overstated the amount of his solvent credits, and the assessor adopted the erroneous figure as the basis of the assessment. The Supreme Court treated the tax there as based pro tanto on nonexistent property and held the

taxpayer entitled to a refund. A similar result was reached in *Associated Oil Co.* v. *County of Orange,* 4 Cal.App.2d 5 [40 P.2d 887], where the taxpayer had inadvertently overstated the oil production of his land, and the assessor used the oil production as a yardstick for the assessment.

In *Utah Constr Co.* v. *Richardson,* 187 Cal. 649 [203 P. 401], the taxpayer attacked a franchise tax assessment made by the State Board of Equalization, contending that the board arbitrarily determined the amount of tax it wanted to collect, and then calculated an assessment to produce the desired tax. The Supreme Court reviewed the evidence introduced by the taxpayer and concluded it was insufficient to overcome the presumption that the board had properly performed its official duties. Had the court taken the view that the assessment was the "only evidence of the acts and intentions of the assessor," it would not have been necessary to consider the taxpayer's evidence at all.

Though none of this group of cases discusses the admissibility of evidence as such, these decisions do reflect the view of the courts that where it can be established that an assessment is based upon property which is exempt, outside the jurisdiction, or nonexistent, the taxpayer is entitled to judicial relief. Where, as here, the assessor lumps in a single entry, "Personal Property $22,640,370," judicial review would be unnecessarily restricted if the court could not inquire as to what property the assessor intended to include. Nor is there any reason to believe the assessor would have any serious difficulty in showing what property he had appraised.

In this case the evidence of what the assessor did and what he intended to do is simple and clear. The deputy who prepared the assessments for all of the aircraft manufacturers in Los Angeles County testified that assessments of business personal property of manufacturing corporations in 1954 were invariably made from the books of the company rather than from a view of the property. He understood the constant cost method of accounting for work in process, knew that it had been used by some aircraft manufacturers other than plaintiff, and knew that plaintiff used it in the work-in-process inventory for the Constellation series. He understood that under the constant cost method of accounting a portion of the cost incurred in producing the earlier completed units of the series would appear on the company's books as a part of the inventory value of the later units of the series. He knew that the inventory so computed was carried as an asset in the com-

pany's balance sheet which was published to the shareholders and to the public, and used in its reporting of federal income taxes. It was also a fact, as the assessor was aware, that plaintiff made semiannual studies of its costs to determine whether the estimated costs should be revised. It appeared that in December 1953 plaintiff had concluded that the Constellation program would exceed the selling price by some $4,943,308. That amount was taken out of the work-in-process account in December 1953 and taken as a loss on the profit and loss statement for 1953. The assessor intended to and did appraise the market value of the work in process at 90 per cent of the book value as it stood on plaintiff's books of account on March 1, 1954, and then reduced this 90 per cent by one-half for equalization purposes.

From the evidence, no inference is possible other than that the assessor, knowing and understanding how the books were kept, intended to and did value the existing work in process by using as a starting point the figure which the plaintiff itself showed on its books as the asset value of that work in process.

The conclusion urged by plaintiff—that the assessor was assessing airplanes which had been previously sold and delivered—can be supported only upon the hypothesis that an uncompleted airplane can only be valued by reference to its direct labor costs, and that the assessed value of an uncompleted airplane may not, as a matter of law, be based upon any labor costs except for the labor directly employed in the fabrication of that unit.

Lest we be misled by a preoccupation with cost accounting theory, it is important to recall that the object of the assessor's search is value, not cost. The code requires that "all taxable property shall be assessed at its full cash value." (Rev. & Tax. Code, § 401.) "Full cash value" is defined in the code as "the amount at which property would be taken in payment of a just debt from a solvent debtor." (Rev. & Tax. Code, § 110.) █ The term "market value" is used by the courts as synonymous with "full cash value." (*Crocker* v. *Scott,* 149 Cal. 575, 585 [87 P. 102] ; *De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 562 [290 P.2d 544].) █ It is a truism that cost is not necessarily value, even though it is sometimes a useful indicator of value. (See *Mahoney* v. *City of San Diego,* 198 Cal. 388, 401 [245 P. 189].)

█ It is not uncommon that the assessor must place a "market value" on property for which there is no market.

In such a case the assessor must use such pertinent factors as are available to him. (See *Michael Todd Co.* v. *County of Los Angeles,* 57 Cal.2d 684, 696 [21 Cal.Rptr. 604, 371 P.2d 340] ; *Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 623 [184 P.2d 879].)

Ninety-nine partially built Constellations, in varying stages of completion, present a special problem in valuation. There is no market in partially built aircraft as such. Cost of production of a single unit is a poor yardstick because, as the record here shows, the actual labor cost of assembling the first plane is approximately three times the cost of assembling the eightieth plane, yet each, when completed, has approximately the same market value. It is not inconceivable that the assessor would conclude that the so-called excess labor cost of assembling the earlier units was an investment in know-how which gave added value to the partially completed unit Number 80 as it went down the assembly line.

In considering the relationship between value and cost of production it is worth noting that book values of assets which appear on balance sheets are commonly made up by accumulating items of cost—even as the plaintiff's work-in-process account here was accumulated. As plaintiff's vice president for finance testified, the term ''cash value'' has no meaning in the field of accounting, and when the accountant lists an asset on a balance sheet he is not making a representation of ''value.'' He added, ''I would say they [inventory figures] include the representation that the costs there shown would be recoverable.''

[██] Notwithstanding that accountants do not purport to act as appraisers, courts recognize that the assessor may properly consider book values in determining market value. (*Rittersbacher* v. *Board of Supervisors,* 220 Cal. 535, 544 [32 P.2d 135].)

[██] The business of determining value, whether based upon cost or upon other factors, is the special function of the assessor. A representation by the taxpayer's accountants that the dollars shown for the inventory accounts are ''recoverable'' is something for the assessor to consider in determining what is the value of the tangible property which is referred to in the inventory accounts. In the performance of his official duty, he determines what costs, if any, and what other factors, if any, shall be relied upon as establishing the value of particular property. This is the essence of the appraisal function which the law commits to the assessor and to the board of equalization. (*Marsh Wall Products, Inc.* v.

*County of Los Angeles,* 193 Cal.App.2d 58 [13 Cal.Rptr. 699].)

There is nothing inherently improbable in the assessor's statement that he regarded the book value assigned by the manufacturer as a valid basis from which to arrive at the "actual cash value" of these unique and unmarketable items of property. There is no basis in the record for concluding, contrary to what the assessor said, that he was appraising something other than the 99 partially completed planes on hand.

When plaintiff's claim for refund was received by the board of supervisors in October 1957, the deputy assessor who was responsible for the assessment in question was asked to make a report. He answered plaintiff's contention as follows:

"What Lockheed is attempting to do is say that a portion of the inventory shown on their books and records is no longer in their possession. This is not the case. The assessment on the commercial inventory is made from the total book value of that inventory, and it does not follow that if costs are included in that inventory, which costs may be attributable to some item not physically in Lockheed's possession at the moment, the value of the entire inventory is reduced thereby.

"The petition clearly states that this is a valuation technique used by the company and that this valuation technique has been approved by their outside auditors; that this valuation technique has the approval of the Securities and Exchange Commission; and that the same valuation technique has been approved by the Bureau of Internal Revenue. If the value is correct for stockholders purposes, for potential stock buyers purposes, and for income tax purposes, how can it be incorrect for ad valorem tax purposes."

The foregoing is not to say that the assessor was *correct* in so appraising the value of plaintiff's work in process. That is not for the court to say. This is a matter to be determined, in the first instance, by the assessor in the exercise of his official duties, and subsequently by the board of equalization, which sits in a judicial capacity to decide questions of valuation. (*Birch* v. *County of Orange,* 186 Cal. 736, 741 [200 P. 647]; *Eastern-Columbia, Inc.* v. *County of Los Angeles,* 61 Cal.App.2d 734, 744 [143 P.2d 992].) What we are saying is that the assessor, without any question, purported to and did make his assessment upon the basis of the value which he gave to the 99 partially completed planes owned by plaintiff on the tax day. This case

involves only plaintiff's dissatisfaction with the valuation which the assessor gave to its property, and the manner in which he arrived at his figure. This is a question which cannot be raised for the first time in court by a party who failed to bring the matter seasonably before the board of equalization.

Though we have assumed that the court may look beyond the assessment roll to determine what property was actually assessed, we find no justification for a court to conclude, on the basis of an accounting theory, that the assessor was constructively assessing some property other than that which he purported to assess. Certainly none of the authorities relied upon by plaintiff authorizes such a thing. In *Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157 [272 P.2d 16]; *Third & Broadway Bldg. Co.* v. *County of Los Angeles,* 220 Cal. 660 [32 P.2d 377]; *Brenner* v. *City of Los Angeles,* 160 Cal. 72 [116 P. 397]; *Parrott & Co.* v. *City & County of San Francisco,* 131 Cal.App.2d 332 [280 P.2d 881]; and *City of Los Angeles* v. *Board of Supervisors,* 108 Cal.App. 655 [292 P. 539], the assessor assessed property which was wholly or partially exempt. In *Pacific Coast Co.* v. *Wells,* 134 Cal. 471 [66 P. 657], and *Associated Oil Co.* v. *County of Orange,* 4 Cal. App.2d 5 [40 P.2d 887], the assessor, through error, assumed the existence of property which did not in fact exist.

In *Stewart etc. Co.* v. *County of Alameda,* 142 Cal. 660 [76 P. 481], and *Kern River Co.* v. *County of Los Angeles,* 164 Cal. 751 [130 P. 714], the assessor included property which was physically outside the boundaries of the taxing district. In *Weyse* v. *Crawford,* 85 Cal. 196 [24 P. 735], and *Teater* v. *Johnson,* 95 Cal.App. 182 [272 P. 313], the property was owned by someone other than the person to whom it was assessed. In *Star-Kist Foods, Inc.* v. *Quinn,* 54 Cal.2d 507 [6 Cal.Rptr. 545, 354 P.2d 1], it appeared from the assessor's admission that in valuing a possessory interest he had refused to deduct rental values, as required by a statute which the assessor erroneously thought to be unconstitutional. The foregoing are examples of what is meant by wrongful assessment of property not subject to taxation, as distinguished from a wrongful valuation of the property which is subject to tax. In each of the cases relied upon by plaintiff it was clear what the assessor was attempting to reach. The issue in each case was whether the property which the assessor said he was assessing was subject to tax. Where the property or property interest or subject of value which the assessor

appraised could be said to be beyond his reach as a matter of law, no protest to the board of equalization was a prerequisite to judicial relief. But where, as here, the assessor is, by his own statement, and without contradiction, purporting to place a value upon property owned by the taxpayer, within the jurisdiction and not exempt, his misconceptions of value, if they be such, are matters to be corrected by the board of equalization. (*Marsh Wall Products, Inc.* v. *County of Los Angeles,* 193 Cal.App.2d 58, 62 [13 Cal.Rptr. 699].)

In view of what has been said about the applicable law there is only one issue of fact which is material to the decision, and on that issue the evidence will support only one result. Before an appellate court may make new findings as the basis of a reversal with directions to enter judgment for appellant it must appear from the record "that on no theory grounded in reason and justice could the party defeated on appeal make a further substantial showing in the trial court in support of his cause." (See *Tupman* v. *Haberkern,* 208 Cal. 256, 269 [280 P. 970].) This is such a case. Pursuant to the authority conferred by Code of Civil Procedure, section 956a, we find that the assessment in question was based entirely upon the assessor's estimate of the value of the personal property owned by plaintiff on March 1, 1954; and that none of said assessment purported to be or was upon property which had been sold or delivered prior to that day.

The judgment is reversed with directions to enter judgment for defendants.

Ford J., concurred.

Shinn, P. J., did not participate.

Respondent's petition for a hearing by the Supreme Court was denied October 17, 1962.