978 So.2d 745 (2008)
Ex parte HEALTHSOUTH CORPORATION.
In re HealthSouth Corporation
v.
Jefferson County Tax Assessor, Dan Weinrib, and Jefferson County Tax Collector, J.T. Smallwood.
1060296.
Supreme Court of Alabama.
August 24, 2007.
Joseph B. Mays, Jr., Bruce P. Ely, and Marc James Ayers of Bradley Arant Rose & White, LLP, Birmingham, for petitioner.
Charles S. Wagner, asst. county atty., Birmingham, for respondents.
Troy King, atty. gen., Kevin Newsom, deputy atty. gen., and G. Ward Beeson III, asst. Atty. gen., for amicus curiae State of Alabama, in support of the respondents.

On Application for Rehearing
LYONS, Justice.
The opinion of May 4, 2007, is withdrawn, and the following is substituted therefor.
*747 HealthSouth Corporation appealed to the Court of Civil Appeals from a judgment of the Jefferson Probate Court in favor of Dan Weinrib, the Jefferson County tax assessor, and J.T. Smallwood, the Jefferson County tax collector ("the taxing authorities"). The Court of Civil Appeals affirmed the judgment of the probate court. HealthSouth Corp. v. Jefferson County Tax Assessor, 978 So.2d 737 (Ala. Civ.App.2006). HealthSouth then petitioned this Court for a writ of certiorari, and we granted HealthSouth's petition to review two issues presented by this case. We affirm the judgment of the Court of Civil Appeals.

I. Factual Background and Procedural History

For the tax years 2001, 2002, and 2003, HealthSouth submitted personal-property tax returns to the Jefferson County tax assessor on which it intentionally listed numerous fictitious items of personal property and assigned fabricated values to those items.[1] HealthSouth paid taxes for the years 2001 and 2002 based on the submitted returns. Before paying the amount due for 2003, however, HealthSouth amended its tax return for that year to remove the fictitious assets. The Jefferson County tax assessor allowed the adjustment as to 2003. HealthSouth then amended its 2001 and 2002 returns and filed petitions for a refund of the portion of ad valorem personal-property taxes it claims it overpaid as a result of listing the fictitious items of personal property on its tax returns for 2001 and 2002. The Jefferson County tax collector requested an opinion from the attorney general, who determined that no refund was due. The tax collector then denied the petitions for a refund of the taxes HealthSouth had paid for 2001 and 2002 on the fictitious property.
HealthSouth filed an action in the Jefferson Probate Court challenging the tax collector's refusal to grant its petitions for the refund of ad valorem taxes paid on personal property for the years 2001 and 2002. When the probate court denied the petitions for refund, HealthSouth appealed to the Court of Civil Appeals. That court affirmed the judgment of the probate court. The Court of Civil Appeals held that § 40-10-160, Ala.Code 1975, providing for tax refunds based upon a mistake or an error, did not permit a refund when the taxpayer's overpayment resulted from the taxpayer's intentionally false statements as to the value of nonexistent assets. The Court of Civil Appeals further held that "HealthSouth's violation of its duty to provide correct and truthful information on its tax returns did not abrogate the tax assessor's authority to affix values for assessment purposes to the property listed on HealthSouth's tax returns." 978 So.2d at 744. This Court granted certiorari to consider two questions of first impression: whether the term "error" has a meaning different from the term "mistake," specifically whether the former term is broad enough to encompass intentional dishonest conduct; and whether an intentional misrepresentation by a taxpayer in reporting property on a tax return can create a right in the taxing authorities to collect and retain taxes on nonexistent property so that no refund of taxes collected because of such an error can be had under § 40-10-160, Ala.Code 1975.

*748 II. Standard of Review

"In reviewing a decision of the Court of Civil Appeals on a petition for a writ of certiorari, this Court `accords no presumption of correctness to the legal conclusions of the intermediate appellate court. Therefore, we must apply de novo the standard of review that was applicable in the Court of Civil Appeals.' Ex parte Toyota Motor Corp., 684 So.2d 132, 135 (Ala.1996). Because the material facts before the Court of Civil Appeals were undisputed, that court's review of the trial court's ruling would be de novo as well. State Dep't of Revenue v. Robertson, 733 So.2d 397, 399 (Ala. Civ.App.1998). This is particularly true where the intermediate appellate court is construing statutory provisions. Robertson, supra; Pilgrim v. Gregory, 594 So.2d 114, 120 (Ala.Civ.App.1991)."
Ex parte Exxon Mobil Corp., 926 So.2d 303, 308 (Ala.2005).

III. Analysis

A. Whether "Error" Has a Meaning Different from "Mistake"
Section 40-10-160 provides:
"Any taxpayer who through any mistake, or by reason of any double assessment, or by any error in the assessment or collection of taxes, or other error, has paid taxes that were not due upon the property of such taxpayer shall be entitled, upon making proof of such payment to the satisfaction of the Comptroller, to have such taxes refunded to him if application shall be made therefor, as hereinafter provided, within two years from the date of such payment."
(Emphasis added.)
This Court's decision to grant HealthSouth's petition for the writ of certiorari was triggered by the pivotal issue of the significance, if any, of the legislature's choice of two words"error" and "mistake"in its refund statute and its linking those words with the disjunctive conjunction "or." The parties have wrestled mightily with parsed definitions from various sources that might afford a separate field of operation for each term. Of course, HealthSouth contends that "error" can embrace an intentional act and therefore that its fraudulent inclusion on its personal-property tax returns of assets that did not exist constitutes the type of activity for which it is entitled to relief pursuant to § 40-10-160 in the form of a refund of taxes paid. HealthSouth does not contend that "mistake" embraces its activities. The taxing authorities,[2] on the other hand, argue that neither "error" nor "mistake" includes deliberate, intentional acts of the character committed by HealthSouth.
The Court of Civil Appeals, after citing definitions for each word, concluded:
"Although HealthSouth may be correct that the plain meaning of the word `mistake' is slightly different from the plain meaning of the word `error,' we are clear to the conclusion that an intentional misrepresentation is not included in the plain meaning of either word."
978 So.2d at 741.
We conclude that the Court of Civil Appeals was correct. While nuanced definitions of the two words could considerably lengthen this opinion, there is ample authority for the proposition that neither "error" nor "mistake" contemplates dishonest activity. This Court considered the significance of a legislative choice of "clerical *749 error" and "other mistake of the clerk" in Ford v. Tinchant & Brother, 49 Ala. 567, 571 (1873). Although the Ford Court concluded that each of the terms had a separate field of operation, a limitation in its holding is significant to the issue in this case. This Court in Ford stated:
"The legislature cannot be held to have been so careless of language, as to have used the expressions `clerical error,' and `other mistake of the clerk,' in exactly synonymous sense, in view of the liability to mistake in the entries and record of causes; or to have excluded from amendment the manifest oversights and inaccuracies of the counsel, not calculated to mislead, in permitting the correction of `any error in fact in the process.'"
(Emphasis added.) Thus, in Ford this Court qualified the field of operation of "clerical error" and "other mistake of the clerk" by embracing only conduct that was "not calculated to mislead."
In Alabama & Georgia Lumber Co. v. Tisdale, 139 Ala. 250, 36 So. 618 (1903), the amount of the judgment enforcing a mechanic's lien was less than the amount that had previously been claimed in the statement of lien filed in the office of judge of probate. The validity of the lien was challenged on the basis of the discrepancy. The applicable statute provided: "[N]o error in the amount of the demand or in the name of the owner or proprietor shall affect the lien. . . ." 139 Ala. at 255, 36 So. at 619. The Court observed:
"Fraud is never presumed. On the facts found, the discrepancy can and should be accounted for on the ground of a mistake or error. . . .
". . . Whether the present statute was intended to prevent a destruction of the lien when the amount in the statement was intentionally made excessive in order to secure to the lienor a fraudulent advantage, we will not decide. But where, as here, no fraudulent purpose or intent is found to exist, we are clearly of [the] opinion that the lien is not impaired or destroyed by the error as to the amount."
139 Ala. at 256-57, 36 So. at 620. Later, in Fleming v. McDade, 207 Ala. 650, 651, 93 So. 618, 619 (1922), this Court was required to resolve the question left unanswered in Alabama & Georgia Lumber Co. This Court stated:
"In Ala. & Ga. Lbr. Co. v. Tisdale, 139 Ala. 250, 257, 36 South. 618 [(1903)], there is to be found a query whether the present statute [providing for protection from destruction of the lien for error in the amount of the demand] was intended to prevent the destruction of the lien, as held in Lane & Bodley Co. v. Jones, [79 Ala. 156 (1885), holding that a fraudulent statement vitiated the lien] under the statute then in force, as to which no opinion was expressed. We are clearly of the opinion, however, that the principle announced in the older case has been in no wise affected by the provision of the present statute that `no error in the amount of the demand, . . . shall affect the lien'; for this means merely an inadvertent or honest mistake, and not a willfully false claim."
In Scheuer v. Berringer, 102 Ala. 216, 14 So. 640 (1894), dealing with error or mistake, on the one hand, or fraud, on the other, in settlements of accounts between partners, this Court recognized differing relief available attending each circumstance. This Court quoted with approval the trial court's order, which in turn quoted Cowan v. Jones, 27 Ala. 317, 325 (1855), in which this Court stated, "`"The rule is settled that, where errors or mistakes only are shown, the account will not be opened, as where fraud is shown; but the party alleging error or mistake in the account, *750 will be permitted to surcharge and falsify it."'" 102 Ala. at 220, 14 So. at 642. The trial court's order continued:
"`In Moses [Bros.] v. Noble['s Adm'r], 86 Ala. 407, [410, 5 So. 181, 182 (1888),] Justice Clopton remarks: "In the absence of allegation and proof of fraud or undue influence, which taints the entire account, the court will not open and unravel as if no account had been made. . . . When only errors or mistakes are made, alleged, and proved, wrong charges which should be deducted, or omission of credit which should be allowed, the court will give the party complaining permission to surcharge and falsify the account, and limits its authority to a correction of the errors or mistakes."'"
102 Ala. at 220, 14 So. at 642. Scheuer was followed in Burks v. Parker, 192 Ala. 250, 68 So. 271 (1915).
In the context of acts of a municipality, this Court has limited error or mistake to honest activity:
"Bad faith is synonymous with fraud. 6 C.J. pp. 880, 881; Morton & Bliss v. [New Orleans & Selma] Railway Co., 79 Ala. 590, 617 [(1885)]. Error or mistake of judgment, in the exercise of a discretionary power, is not the equivalent of bad faith or fraud. In such circumstances, error or mistake of judgment consists with honest intention, or freedom from unworthy or unlawful motive or design."
Pilcher v. City of Dothan, 207 Ala. 421, 424, 93 So. 16, 19 (1922) (emphasis added).
HealthSouth accuses the Court of Civil Appeals of rewriting § 40-10-160 by refusing to permit the modifier "any," used in the statute to modify both error and mistake, to have a field of operation. But adopting HealthSouth's view requires us to expand the commonly understood and long-settled scope of the terms "error" or "mistake," contrary to this Court's treatment of those terms over the years. Indeed, in Fleming v. McDade, the statute in question used an equally broad adjective in providing that "no error in the amount of the demand, . . . shall affect the lien." 207 Ala. at 651, 93 So. at 619 (emphasis added). As previously noted, this Court did not permit such language, contrary to common usage, to sweep so broadly as to protect a party from the destruction of its lien by reason of its fraudulent statement of amount.
We are not led to a different conclusion by reason of a recent opinion of a Georgia trial court recognizing HealthSouth's right to a refund pursuant to a Georgia statute.[3] Section 48-5-380(a), Ga.Code Ann., provides:
"Each county and municipality may refund to taxpayers any and all taxes and license fees which are determined to have been erroneously or illegally assessed and collected from the taxpayers under the laws of this state or under the resolutions or ordinances of any county or municipality or which are determined to have been voluntarily or involuntarily overpaid by the taxpayers."
(Emphasis added.) In Marconi Avionics, Inc. v. DeKalb County, 165 Ga.App. 628, 630, 302 S.E.2d 384, 385-86 (1983), relied upon by the Georgia trial court, the Georgia Court of Appeals stated: "We interpret the refund statute according to its literal and logical meaning: it applies to all property `erroneously or illegally assessed' *751 and taxes `voluntarily or involuntarily overpaid,' for whatever reason." Section 40-10-160 is materially different from the Georgia statute.
Finally, we note that HealthSouth contends that the Court of Civil Appeals has disregarded the rule of construction of statutes that presumes every word has some purpose and that no superfluous provisions are used. See Ex parte Panell, 756 So.2d 862, 867 (Ala.1999). Our determination that the words "error" and "mistake" are not consistent with dishonest acts, regardless of whatever else they might mean, obviates the necessity for determining the applicability of this presumption. Nevertheless, we note that this Court, as well as other jurisdictions, has recognized that that presumption can be overcome by a determination that the legislature has used synonyms. See Anderson v. Hooks, 9 Ala. 704, 709-10 (1846), discussing the significance of a phrase in the Statute of Frauds referring to "the intent or purpose" and concluding:
"The introduction of the term `purpose' into the act, does not impart to it any additional potency. It is only the synonym for design, intention, aimis but a mere expletive, intended to convey the idea which the legislature had in view more strikingly, and might be stricken from the act without affecting its interpretation in any manner."
Likewise, in Caldwell v. State, 32 Ala.App. 228, 230, 23 So.2d 876, 878 (1945), the Court of Appeals held that "[t]he words `oppose' and `resist' as they appear in the [Code] section are synonymous."
"It seems clear that the terms `oppose' and `resist', as they are used in the statute under consideration, convey a legislative intent to protect the officer against obstruction and interference and therefore contemplate the use of either actual or constructive force against the officer who is making an effort to serve or execute the legal writ or process. In other words, it is not made a criminal offense to hinder or interrupt or circumvent the service of the process with which the officer is armed, unless in doing so actual or constructive force is used against the officer himself."
32 Ala.App. at 230-31, 23 So.2d at 878.
Such observations about a legislature's capacity to employ synonyms were summarized in Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 253, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), in which the United States Supreme Court noted the existence of cases recognizing the use of synonyms in statutes, by referring to United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), which it described as "reading `error or defect' to create one category of `error.'" The Court then noted that Olano cited McNally v. United States, 483 U.S. 350, 358-59, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which the Court described as holding that the "second phrase in [the] disjunctive [was] added simply to make the meaning of the first phrase `unmistakable.'" In McNally, the Court stated: "As we see it, adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." 483 U.S. at 359, 107 S.Ct. 2875. See also Southwick v. State, 126 Ark. 188, 190, 189 S.W. 843, 844 (1916) ("The use of the disjunctive `or' between the words `intimidation' and 'threats' in the statute was not in the sense of indicating that they are two different things, but was only used as an alias to designate the same thing by different words."); and Smith v. R.F. Brodegaard & Co., 77 Ga.App. 661, 663-64, 49 S.E.2d 500, 502 (1948):

*752 "We do not think the words `possession, custody, or control,' as used in the statute providing for bail in actions for personalty, mean three different things; or that they state three different situations or grounds on which a plaintiff in trover can require a bond of the defendant. They express an alternative of terms, definitions or explanations of the same thing in different words. They mean substantially the same thing, i.e. that the property is within the power and dominion of the defendant. . . . `The word "or," when used not to connect two distinct facts of different natures, but to characterize and include two or more phases of the same fact, attended with the same result, states but a single ground, and not the alternative.' 46 C.J., 1125(4). This rule of construction has been recognized and applied by our courts in criminal cases and in civil cases."
See also Lewis v. Superior Court, 217 Cal.App.3d 379, 397, 265 Cal.Rptr. 855, 865 (1990) ("Although we endeavor to give effect to every word in a statute, sometimes terms used together are simply synonymous."). Finally, see United States v. Patterson, 55 F. 605, 639 (C.C.D.Mass. 1893):
"The court is well aware of the general rule which has been several times (twice certainly) laid down by the supreme court of the United States, that in construing a statute every word must have its effect, and the consequent presumption that the statute does not use two different words for the same purpose; but this rule has its limitations, and it is a constant practice for the legislature to use synonyms. A word is used which it is thought does not perhaps quite convey the idea which the legislature intends, and it takes another word, which perhaps has to some a little different meaning, without intending to more than make strong the purpose of the expression in the statute."
Even if the terms "error" or "mistake" are synonymous, resort to synonyms for clarity or emphasis is clearly within the prerogative of the legislature.
B. Whether a Taxing Authority Has the Right to Assess and Collect Taxes on the Basis of an Intentional Misrepresentation by the Taxpayer
HealthSouth also argues that even though it intentionally misrepresented assets on its personal-property tax returns, because those assets did not actually exist, the taxing authorities did not have the right to assess and collect personal-property taxes on the assets listed on the tax returns. As to this issue, we affirm the judgment of the Court of Civil Appeals for the reasons set forth in Part II of its opinion of October 27, 2006. The Court of Civil Appeals stated:
"In essence, HealthSouth requested the probate court to invoke its equity jurisdiction to grant the refund petitions. A party seeking equitable relief, however, must have acted with equity and must come into court with clean hands. Levine v. Levine, 262 Ala. 491, 494, 80 So.2d 235, 237 (1955). In J & M Bail Bonding Co. v. Hayes, 748 So.2d 198 (Ala.1999), the Alabama Supreme Court stated:
"`The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when that party's own wrongful conduct renders the assertion of such legal rights "contrary to equity and good conscience." Draughon v. General Fin. Credit Corp., 362 So.2d 880, 884 (Ala.1978). The application of the clean hands doctrine is a matter within the sound discretion of the trial *753 court. Lowe v. Lowe, 466 So.2d 969 (Ala.Civ.App.1985).'
"748 So.2d at 199. HealthSouth cannot be permitted to take advantage of its own wrong by receiving a refund based on its own inequitable conduct. There is no equity in allowing HealthSouth to obtain relief from its own fraudulent scheme."
978 So.2d at 745.
Justice Parker's dissent states: "Such refunds [for overpayment of taxes] are appropriate regardless of the malfeasance of the person seeking the refund. This was noted by Craig M. Boise in Playing with `Monopoly Money': Phony Profits, Fraud Penalties and Equity, 90 Minn. L.Rev. 144, 147-48 (2005), which examines recent incidents of falsely inflated income of major U.S. corporations." 978 So.2d at 758.
The law review article cited by Justice Parker in fact supports the completely opposite view that equitable defenses should be available in actions seeking a tax refund after the taxpayer's fraud in overstating its tax liability has been exposed. The article states:
"Recognizing that companies that inflate their taxable income make the IRS `an unwitting accomplice to . . . fraud,' the Senate, in May 2003, approved a measure that would have increased the penalty for tax fraud to an amount equal to the overpayment of tax attributable to the fraud. The effect of this provision would have been to disallow any refunds of taxes paid on fraudulently inflated income. Unfortunately, the measure was dropped in the conference committee and did not become part of the American Jobs Creation Act of 2004 ultimately signed by President George W. Bush in October 2004. However, this Article suggests that the IRS may be able to achieve the results intended by the omitted Senate provision through the rules of equity. Moreover, equity may well furnish a more sound approach to penalizing offenders in such cases than would a legislative enactment.
"Central to the thesis of this Article is the fact that tax-refund suits are in essence claims in equity, a proposition that has two important implications. First, the taxpayer filing a tax-refund suit is asking the court to impose a fair, just, and equitable `remedy'  namely, the refund of taxes paid in excess of what was due. As an equity claimant, the taxpayer is not in a position to demand that the refund be granted. Second, the fact that refund suits are actions in equity means that claimants are subject to well-established equitable defenses like the doctrine of unclean hands. Based on these twin propositions, this Article asserts that the IRS not only may, but should, assert equitable defenses to deny refunds of taxes paid on fraudulently inflated earnings."

90 Minn. L.Rev. at 150-51 (emphasis added) (footnotes omitted).
The dissenting opinion also relies on the views of three staff reporters of The Wall Street Journal. The dissent states:
"A Wall Street Journal article noted the same principle: `[f]raud or not, the current tax code makes no distinctions. It is a basic tenet of tax law  both for individuals and corporations  that those who overpay are entitled to a refund.' Rebecca Blumenstein, Dennis K. Berman, and Evan Perez, After Inflating Their Income, Companies Want IRS Refunds, The Wall Street Journal, May 3, 2003, at A1."
978 So.2d at 758.
We are more impressed with the holding in Stone v. White, 301 U.S. 532, 535, 57 S.Ct. 851, 81 L.Ed. 1265 (1937):

*754 "The statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received. United States v. Jefferson Electric [Mfg.] Co., 291 U.S. 386, 402 [(1934)]. Since, in this type of action, the plaintiff must recover by virtue of a right measured by equitable standards, it follows that it is open to the defendant to show any state of facts which, according to those standards, would deny the right, Moses v. Macferlan, supra, [2 Burr. 1005] at 1010 [(K.B. 1750)]; Myers v. Hurley Motor Co., 273 U.S. 18, 24, 50 A.L.R. 1181 [(1927)]; cf. Winchester v. Hackley, 2 Cranch 342[(1805)], even without resort to the modern statutory authority for pleading equitable defenses in actions which are more strictly legal, Jud.Code, § 274b, 28 U.S.C. § 398."

IV. Conclusion

The settled meaning of the terms "error" and "mistake" is not consistent with intentional dishonest acts. Furthermore, HealthSouth's intentional misrepresentation of its assets did not abrogate the right of the taxing authorities to assess and collect personal-property taxes from HealthSouth based upon the information HealthSouth provided on its personal-property tax return. We therefore affirm the judgment of the Court of Civil Appeals.
APPLICATION OVERRULED; OPINION OF MAY 4, 2007, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
COBB, C.J., and WOODALL, STUART, and SMITH, JJ., concur.
SEE, J., concurs in the rationale in part and concurs in the result.
PARKER, J., concurs in part and dissents in part.
BOLIN and MURDOCK, JJ., recuse themselves.
SEE, Justice (concurring in the rationale in part and concurring in the result).
I fully join in the holding of the main opinion. I agree that neither "mistake" nor "error" in this statute encompasses HealthSouth's deliberate misrepresentations on its tax returns. I write specially only to note that I do not consider it necessary to determine whether the legislature could have intended to use the terms "error" and "mistake" as synonyms. Therefore, I do not join in that discussion.
PARKER, Justice (concurring in part and dissenting in part).
I concur with the conclusion of the main opinion on the first issue  whether the term "error" differs from the term "mistake," specifically, whether "error" is broad enough to encompass intentional conduct. However, I dissent from the adoption by the majority of the rationale of the Court of Civil Appeals' opinion on the second issue  whether an intentional misrepresentation by a taxpayer in reporting property can create a right to collect and retain taxes on nonexistent property so that no refund of taxes collected due to such an error can be had under § 40-10-160, Ala.Code 1975.
The majority opinion, by affirming the judgment of the Court of Civil Appeals on this issue, effectually holds that the State has the authority to tax nonexistent property. The Court of Civil Appeals distinguished the present case from City of Birmingham v. Piggly Wiggly Alabama Distributing Co., 638 So.2d 759, 765 (Ala. 1994), in order to contradict HealthSouth's contention that the tax assessor *755 had no authority to assess nonexistent personal property to HealthSouth. The Court of Civil Appeals' opinion notes that Piggly Wiggly involved a mistake, whereas the present case involves an intentional misrepresentation. That opinion holds that in an instance of mistake, such as in Piggly Wiggly, the assessor is without authority to assess the property. But in this case, the Court of Civil Appeals held:
"The tax assessor was authorized to assess the taxes based on the lists provided by HealthSouth. HealthSouth's violation of its duty to provide correct and truthful information on its tax returns did not abrogate the tax assessor's authority to affix values for assessment purposes to the property listed on HealthSouth's tax returns."
978 So.2d at 744 (citation omitted). Although this mistake/intentional-misrepresentation distinction does distinguish Piggly Wiggly from this case, it is irrelevant. The forms an entity fills out may give the assessor authority to assess the value of the property listed; however, this presupposes there is property listed that has value to be assessed. Nonexistent property has no value, and without property to assess, the assessor is without authority.
The Court of Civil Appeals also suggested that equity has a place in tax matters. 978 So.2d at 744 (citing Sims v. White, 522 So.2d 239, 240 (Ala.1988)). However, equity may not prevent HealthSouth from receiving a refund, because it is illegal for the tax assessor to assess nonexistent property.[4] "`Illegal' is defined generally as `[a]gainst or not authorized by law.'" Piggly Wiggly, 638 So.2d at 765 (quoting Black's Law Dictionary 747 (6th ed.1990)). Because the assessor has no authority to assess nonexistent property, it is illegal for the assessor to do so. There is no constitutional or statutory support for the proposition that the assessor is authorized to assess nonexistent property.

Constitutional and Statutory Construction
The Alabama Constitution of 1901, § 211, explicitly limits the State's taxing authority:
"All taxes levied on property in this state shall be assessed in exact proportion to the value of such property. . . . "
Nonexistent property has no value; therefore, nonexistent property may not be taxed. The "value of [nonexistent] property" is zero. Any "exact proportion" of zero is zero.
*756 This Court has recognized the following three principles regarding the government's power of taxation:
"(1) The power of taxation is an incident of sovereignty and is possessed by the government without being expressly conferred by the people.
"(2) The power is purely legislative.
"(3) So long as no constitutional limitations are exceeded, the Legislature is of supreme authority, and the courts, as well as all others, must obey."
State v. Birmingham So. Ry., 182 Ala. 475, 479, 62 So. 77, 79 (1913). This Court noted that "[t]he purpose and scope of this constitutional limitation . . . is that it was designed to secure uniformity and equality by the enforcement of an ad valorem system of taxation and to prohibit arbitrary or capricious modes of taxation without regard to value." 182 Ala. at 480-81, 62 So. at 79 (emphasis added). This Court further stated that "[i]f the legislative provision in question is unconstitutional, it must be because it is repugnant to one or more of the following sections of the state constitution: Section 211. . . ." 182 Ala. at 479, 62 So. at 79.
The authority of the tax assessor is derived from the legislature through § 40-7-1, Ala.Code 1975, as shown below, and if that authority is to extend to nonexistent property, the statute would be unconstitutional because it would be repugnant to § 211, Ala. Const.1901. It is a well-settled principle of statutory construction that a statute should be construed to avoid conflict with the constitution. The Constitution of Alabama establishes the extent of the authority to tax property when it states: "All taxes levied on property in this state shall be assessed in exact proportion to the value of such property." Ala. Const.1901, § 211. This section "prohibit[s] the Legislature from prescribing or declaring an arbitrary or artificial value of the property of individuals or corporations, and assessing taxes on such valuation." Birmingham So. Ry., 182 Ala. at 481, 62 So. at 79 (citing Assessment Board v. A.C.R.R., 59 Ala. 551 (1877)). Section 211 prevents placing an "artificial value" on nonexistent property. Such a valuation would disregard the constitutional mandate that the tax is to be "in exact proportion to the value of the property. Nonexistent property has no value. Therefore, if the authority of the assessor, derived from § 40-7-1, is to be read to include nonexistent property, the statute conferring that authority would be repugnant to § 211 and, therefore, unconstitutional.
Taxation statutes are to be strictly construed against the taxing authority: "[W]e are here concerned with a taxing act, with regard to which the general rule requiring adherence to the letter applies with peculiar strictness." Crooks v. Harrelson, 282 U.S. 55, 61, 51 S.Ct. 49, 75 L.Ed. 156 (1930). In United States v. Merriam, 263 U.S. 179, 187-88, 44 S.Ct. 69, 68 L.Ed. 240 (1923), the Supreme Court stated: "[I]n statutes levying taxes the literal meaning of the words employed is most important for such statutes are not to be extended by implication beyond the clear import of the language used." "[I]f there is a serious doubt as to taxability, the doubt should be resolved in favor of the taxpayer." Western Elec. Co. v. United States, 564 F.2d 53, 66, 215 Ct.Cl. 100, 124 (1977)(citing Allstate Ins. Co. v. United States, 530 F.2d 378, 209 Ct.Cl. 1 (1976); Ellis v. United States, 416 F.2d 894, 897 (6th Cir.1969); and McFeely v. Commissioner, 296 U.S. 102, 111, 56 S.Ct. 54, 80 L.Ed. 83 (1935)). "A basic rule of statutory construction is that ambiguous tax statutes are construed against the taxing authority and in favor of the taxpayer." Birmingham v. AmSouth Bank, N.A., 591 So.2d 473, 477 (1991) (citing Alabama Farm Bureau Mut. Cas. Ins. *757 Co. v. City of Hartselle, 460 So.2d 1219 (Ala.1984); Owen v. West Alabama Butane Co., 278 Ala. 406, 178 So.2d 636 (1965); and Miller v. Standard Nut Margarine Co., 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422 (1932)).
The Court of Civil Appeals concluded that the tax assessor was authorized to assess taxes on the assets HealthSouth listed on its tax returns. 978 So.2d at 743 (relying on § 40-7-1(a), § 40-7-27, and § 40-7-34). "HealthSouth's violation of its duty to provide correct and truthful information on its tax returns did not abrogate the tax assessor's authority to affix values for assessment purposes to the property listed on HealthSouth's tax returns." 978 So.2d at 744. Therefore, the Court of Civil Appeals concluded, it was not illegal to assess value on the nonexistent property, because the tax assessor had the authority to do so and that authority was not abrogated.
The Court of Civil Appeals misinterprets the statutes that give the tax assessor his authority. The only statute relevant to the issue of authority, because it is the only statute that addresses the issue of authority, is § 40-7-1, which provides: "The tax assessor . . . shall have the right and authority to assess all . . . personal property to the party last assessing the same, or to the owner of record. . . ." That court concluded that because the statute gives authority to the assessor to "assess all personal property . . . to the owner of record" and because HealthSouth included the nonexistent property on its returns, the statute gives the assessor authority over the nonexistent property. However, § 40-7-1 nowhere grants authority to the tax assessor to assess nonexistent property. The phrase "owner of record" allows the assessor to assess the property listed on the return, but this necessarily presumes that the property listed actually exists and has value. Even though it may be listed, nonexistent property has no owner  of record or otherwise  and no value capable of being assessed. Even if somehow we were to conclude that the assessor could assess fictitious property, no verifiable valuation criteria would exist by which to do so.
If doubt exists as to whether the State has constitutional or statutory authority to tax nonexistent property, we must return to the basic axiom of statutory interpretation set forth above: Taxation statutes are to be construed strictly in favor of the taxpayer and against the State.

Analogous Cases
Taxes are to be assessed in exact proportion to the value of the property taxed. Although it has been stated that this valuation may be a percentage of the actual value, see State v. Birmingham So. Ry., supra, and the valuation process is not always accurate, see Hamilton v. Adkins, 250 Ala. 557, 35 So.2d 183 (1948), if that proportionate value is overstated, in the case of nonexistent or exempt property, and the taxes collected are beyond those owed, then refunds have been allowed. "In Pacific Coast Co. v. Wells, 134 Cal. 471, [66 P. 657 (1901)], the taxpayer inadvertently overstated the amount of his solvent credits, and the assessor adopted the erroneous figure as the basis of the assessment. The Supreme Court treated the tax there as based pro tanto on nonexistent property and held the taxpayer entitled to a refund." Lockheed Aircraft Corp. v. County of Los Angeles, 207 Cal.App.2d 119, 126-27, 24 Cal.Rptr. 316, 321 (1962). In Lockheed, the court stated that the various refund decisions "reflect the view of the courts that where it can be established that an assessment is based upon property which is exempt, outside the jurisdiction, or nonexistent, the taxpayer is entitled to judicial relief." 207 Cal.App.2d *758 at 127, 24 Cal.Rptr. at 321. Therefore, an overpayment of tax should result in a tax refund.
Such refunds are appropriate regardless of the malfeasance of the person seeking the refund. This was noted by Craig M. Boise in Playing with "Monopoly Money": Phony Profits, Fraud Penalties and Equity, 90 Minn. L.Rev. 144, 147-48 (2005), which examines recent incidents of falsely inflated income of major U.S. corporations.[5] A Wall Street Journal article noted the same principle: "[f]raud or not, the current tax code makes no distinctions. It is a basic tenet of tax law  both for individuals and corporations  that those who overpay are entitled to a refund." Rebecca Blumenstein, Dennis K. Berman, and Evan Perez, After Inflating Their Income, Companies Want IRS Refunds, The Wall Street Journal, May 3, 2003, at A1. Additionally, many articles have reported that HealthSouth, Enron Corporation, and WorldCom are seeking tax refunds from the Internal Revenue Service ("the IRS"). See, e.g., Associated Press, Judge orders Scrushy to pay back millions in HealthSouth bonuses, Bradenton Herald, Jan. 5, 2006, which stated: "Combined with as much as $265 million in refunds the company is seeking from the federal government for taxes it paid on overstated income during the fraud, the court-ordered repayment could help shore up the finances of HealthSouth."
Although taxpayers who fraudulently increase their income are entitled to a refund, we may have difficulty determining whether these taxpayers actually get a refund. The IRS requires confidentiality of federal income-tax returns. 26 U.S.C. § 6103. Nonetheless, some reports may come from the corporations themselves, as was the case for MCI, formerly WorldCom. "MCI, formerly known as WorldCom Inc., has already collected nearly $300 million in overpayments from the I.R.S., a company spokeswoman said. The telecommunications giant's accounting irregularities total $11 billion." Anitha Reddy and Christopher Stern, Firms Want Refunds of Tax on Fake Profit; MCI Collects Almost $300 Million, The Washington Post, final ed. May 3, 2003, at E1. The State of Alabama should not deny refunds on nonexistent property when the IRS provides refunds of taxes paid on nonexistent income.

Punitive Aspect Is Misdirected
The Court of Civil Appeals' opinion concludes: "HealthSouth cannot be permitted to take advantage of its own wrong by receiving a refund based on its own inequitable conduct." 978 So.2d at 745. HealthSouth is not seeking to "take advantage of its own wrong"; rather, HealthSouth is asking to be placed in the position it would be in if the property had been reported and assessed properly. In so doing, HealthSouth is attempting to right the wrong done to its shareholders by its former officers or agents.
*759 Any effort to hold HealthSouth accountable for the fraud of its former officers should not overlook the fact that those who have suffered most as a result of HealthSouth's wrongdoing are its innocent stockholders. HealthSouth's former officers who were involved in the fraud have already, for the most part, borne the consequences of their actions. Penalizing HealthSouth further by retaining this tax would not be an act of reprimand, but a misplaced chastisement of the innocent shareholders, because withholding the tax refund would prevent the shareholders and creditors from using the tax refund to mitigate damages. As Boise says, "After all, the direct cost of any penalty generally will be borne by shareholders in addition to the potential indirect costs associated with the penalty." Playing with "Monopoly Money," 90 Minn. L.Rev. at 201. Retaining the excess tax does not deter future tax fraud, because those who perpetrated the fraud are not the persons who will suffer from the denial of the refund.
It is true that shareholders assume the risks of their investments. However, the State should not magnify the shareholders' losses by refusing to refund illegal taxes on nonexistent property, especially when, as in this case, the fraud and misrepresentations were concealed from the shareholders.

Conclusion
I therefore dissent  not because I tolerate corporate fraud, but because I see the need to carefully limit the power of the State in the area of taxation. In McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 391, 4 L.Ed. 579 (1819), Chief Justice John Marshall declared: "A right to tax, without limit or control, is essentially a power to destroy." The power to tax nonexistent property adds to the power to destroy the power to redefine reality. This is a power that must not be ceded, even in the most egregious of circumstances.
NOTES
[1] As the Court of Civil Appeals noted, before 2002 several officials of HealthSouth were involved in a scheme to artificially inflate the company's reported earnings and, in furtherance of that scheme, overstated the corporation's fixed assets. The inflated personal-property tax returns reflected the overstated assets.
[2] The State of Alabama has intervened as an amicus curiae in support of the taxing authorities.
[3] HealthSouth relies upon an unpublished opinion rendered by the Superior Court of Clayton County, Georgia, a copy of which HealthSouth provided to this Court. HealthSouth Holdings, Inc. v. Clayton County, Georgia, No. 2005-CV-2056-7 (Clayton Superior Court, October 19, 2006).
[4] The majority opinion quotes Stone v. White, 301 U.S. 532, 535, 57 S.Ct. 851, 81 L.Ed. 1265 (1937), as recognizing that federal tax "`statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received.'" 978 So.2d at 754. In Stone, where a trust had mistakenly paid the tax on money disbursed to a beneficiary when the beneficiary should have paid the tax, the trust sued to recoup the tax payment after the point in time when the Internal Revenue Service could have required the beneficiary to pay the tax. The Supreme Court recognized that equitable principles would apply to the government, as well as to the taxpayer: "Equitable conceptions of justice compel the conclusion that the retention of the tax money would not result in any unjust enrichment of the government." 301 U.S. at 537, 57 S.Ct. 851. The Court found that although the tax-payment procedure had been erroneous, it had "resulted in no unjust enrichment to the government, and in no injury to petitioners or their beneficiary." 301 U.S. at 539, 57 S.Ct. 851.

Here, in contrast, the retention of the tax payment would result in unjust enrichment to the government and injury to the petitioner and its shareholders.
Equity, however, has no place in our constitutional scheme limiting the authority of the tax assessor, explained infra. Moreover, court adoption of equity principles would empower the judiciary to exact penalties against taxpayers that the legislature has not enacted.
[5] As noted in the majority opinion, the author of this article argues "that equitable defenses should be available in actions seeking a tax refund after the taxpayer's fraud in overstating its tax liability has been exposed." 978 So.2d at 753 (emphasis added). The author states that the position he argues "would establish a new precedent." 90 Minn. L.Rev. at 201 ("The use of equitable defenses in denying a fraud-related refund claim in a case like WorldCom's, for example, would establish a new precedent."). In that portion of the article quoted in the majority opinion, the author argues that the Internal Revenue Service should use principles of equity to accomplish what Congress refused to do in 2004  to authorize the Internal Revenue Service to retain the full amount of the overpayment in cases of fraudulent overpayments.

As noted in note 4, supra, equity cannot be employed to expand the constitutionally limited authority of our tax assessors.